UNITED STATES of America, Appellee,

v.

Pasquale PANZA, Seymour Ringle, Charles Fruscione, Gregory Cappello, Gregory Boutelle, Christopher Merlino, Defendants-Appellants.

Nos. 322, 320, 163, 213, 321 and 323, Dockets 84–1032 to 84–1035, 84–1064 and 84–1065.

United States Court of Appeals, Second Circuit.

Argued Oct. 11, 1984.

Decided Dec. 18, 1984.

Joseph Panzer, New York City, for defendant-appellant Pasquale Panza.

Irving Anolik, New York City, for defendant-appellant Seymour Ringle.

Deborah A. Schwartz, New York City (Newman & Adler, New York City, of counsel), for defendant-appellant Charles Fruscione).

A. Brent Blacksburg, Kew Gardens, N.Y., for defendant-appellant Gregory Cappello.

Michael Young, New York City, for defendant-appellant Gregory Boutelle.

Stanley M. Meyer, Brooklyn, N.Y. (Meyer, Light & Diesenhouse, Brooklyn, N.Y., of counsel), for defendant-appellant Christopher Merlino.

Brian E. Maas, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Allyne R. Ross, Diane F. Giacalone, Asst. U.S. Attys., Brooklyn, N.Y., of counsel), for appellee.

Before MANSFIELD and KEARSE, Circuit Judges, and METZNER, District Judge.[*]

MANSFIELD, Circuit Judge:

After a one-month jury trial in the Eastern District of New York before Judge Henry Bramwell on charges of racketeering, 18 U.S.C. § 1962(c), racketeering conspiracy, 18 U.S.C. § 1962(d), and mail

[*] Of the United States District Court for the Southern District of New York, sitting by designation.

fraud, 18 U.S.C. § 1341, five defendants appeal from their following convictions:

(1) Gregory Boutelle and Charles Fruscione, racketeering (1 count), racketeering conspiracy (1 count), mail fraud (13 counts);

(2) Seymour Ringle, racketeering (1 count), racketeering conspiracy (1 count), mail fraud (10 counts);

(3) Christopher Merlino, mail fraud (3 counts);

(4) Pasquale Panza, mail fraud (1 count).

A sixth defendant, Gregory Cappello, who pleaded guilty to one count of mail fraud, appeals from his conviction, claiming that the three-year sentence imposed on him was excessive. We affirm.

The case arises out of an elaborate scheme involving many participants to defraud automobile insurance companies in connection with their issuance of accident insurance policies under the Assigned Risk plan and their payment of claims filed under those policies. Since New York law requires every registered New York automobile to have accident insurance and many drivers cannot obtain the voluntary issuance of such policies because of their bad driving records, age, or places of residence, the state has required all insurance carriers to provide insurance to such drivers through an "Assigned Risk" pool. Under this system each insurer must cover a percentage of these poor risks equal to the percentage of New York State automobile insurance which it voluntarily writes. A separate group entitled the New York State Automobile Insurance Plan ("AIP") has been formed by all automobile insurers involved to administer the system. Normally it assigns to each insurer by random computer selection that company's percentage of applications for assigned risk policies.

The indictment charges that an organized group, of which appellants became members, devised and carried out a mail fraud scheme and racketeering enterprise to defraud certain insurers to whom risks were assigned by AIP. Under the scheme a broker who was a member of the scheme would prepare an application for Assigned Risk insurance coverage for an automobile represented to be in undamaged condition and would bribe a corrupt AIP employee to assign the application by hand to a particular insurance company rather than go through the random assignment computer system. The insured applicant covered by the resulting policy would be either a member of the group or a trusted friend or relative. The insurance company chosen as the target of the fraud would be one whose damage appraiser was a member of the group. Once the policy became effective the broker or some other member of the group would report to the insurer that the insured vehicle had been vandalized or had been involved in an accident in which the insured was clearly liable. The auto would then be appraised at collision shops in Brooklyn or Staten Island that were members of or controlled by the group, using a corrupt appraiser working as a member of the scheme. Like the corrupt AIP employee the appraiser would be paid money for his fraudulent appraisal. The insurer would pay the claim, unaware that it was being victimized and that there had not been any vandalism or collision as claimed.

At trial the government introduced a mass of direct evidence, mainly testimony of participants in the crimes who had pleaded guilty, and of circumstantial evidence, such as insurance company files, in support of the charges. This evidence and the reasonable inferences from it, viewed in the light most favorable to the government, show that over a period of three years (1979–82) approximately 30 people were involved in different aspects of a continuing fraudulent enterprise of the type above described. Most participated for less than the entire period; some were "in and out" of it; and a few took part throughout almost the entire period.

The fraudulent insurance brokers included Stephen Maimin, Jack Weingarten, Jeffrey Cohen, Robert Jarmel, and William Cohen, all of whom testified as government witnesses. The corrupt AIP employees,

who hand-processed the applications for insurance policies, were defendants Fruscione, Merlino, and Boutelle. The insurance companies principally used for the fraudulent scheme were United States Fidelity and Guaranty Insurance Company ("USF & G"), the Michigan Mutual Insurance Company ("Michigan"), the Boston Old Colony Insurance Company ("BOC"), Transamerica Insurance Company ("Transamerica"), and General Accident Insurance Company ("GA"). The individuals who managed the fraudulent business were Steven D'Ambra, owner of "Andy's Auto Body" shop on Staten Island; Joseph Burruezo (also known as "Joe Savage"), employed by Shurco, a company that appraised for USF & G and Michigan; Robert Tarallo, an appraiser for Underwriter's Adjustment Company, which handled all appraisals for BOC; and Anthony Imbesi, owner of the "A to Z Auto Body" shop on Staten Island. In 1980 D'Ambra, Burruezo, Tarallo and Imbesi, all of whom later pleaded guilty to one or more RICO counts, formed their own Staten Island insurance brokerage company, Infinity Brokerage, which prepared AIP applications that were hand-assigned by AIP employee Fruscione to specified insurers in order to enable fraudulent claims to be filed, processed and paid.

The automobiles and names used to carry out the scheme were either fictitious or belonged to participants in the scheme or their relatives, business associates or friends who consented to joint it for the purpose of providing identity as an owner and claimant. A common vehicle would often be used repeatedly as the instrument for a series of fraudulent AIP insurance applications and damage claims, handled by the same brokers using the same AIP employees and the same named owners and addresses on different policies issued by different companies. Addresses were either home addresses of the organizers, post office boxes, or addresses of the organizers' friends and relatives, all of whom knew of and were profiting from the frauds. In sum, the evidence revealed a pattern of scores of inter-related fraudulent claims involving use of common vehicles.

The involvement of appellants was supported by testimony of corrupt insurance brokers, corroborated by insurance records, to the effect that money was paid to Fruscione, Merlino and Boutelle to hand-assign the Assigned Risk insurance applications involving common vehicles to specific companies, thus enabling fraudulent claims to be filed with one or more of the companies specified: USF & G, BOC, GA or Michigan. Two of the brokers, Maimin and Weingarten, testified that Fruscione (who was assistant manager of the eastern region of the AIP) was told that his hand assignments were being obtained to facilitate the filing of fraudulent claims. Against Boutelle there was proof that in return for bribes of money he, at the request of a few of the brokers, hand-assigned hundreds of Assigned Risk applications, which often bore the same names as insureds, though usually with different addresses, to the same few insurance companies. Documents seized from Boutelle contained daily lists of hand-assigned policies, with a record of the insured's name, the date of assignment and the company to whom the corrupt broker requested that the application be assigned. On occasions Boutelle on the same day assigned two applications in the same name to different insurers. In the period from March to May 1982 Boutelle made over 100 such hand-assignments.

The evidence against Merlino was similar to that against Boutelle. Although Merlino hand-assigned only a few applications for Weingarten prior to 1980, in that year the rate and number increased to 30 in the period from March to October, all for one of four companies: USF & G, BOC, GA or Michigan. For hand-assigning each of these applications to a specified company Merlino was paid $30. In July 1980 Weingarten hand-delivered to him an application for a 1979 Cadillac for Doreen Imbesi to be assigned to BOC, even though an application for the same-named insured and same auto had been hand-assigned by Merlino two months previously at Weingarten's re-

quest to USF & G. A conversation between Fruscione and Weingarten in the summer of 1980, in which Fruscione (who was assistant manager of the AIP region in which Merlino was employed), voiced his awareness and approval of Merlino's hand-assignments, indicated that Merlino knew of the scheme.

Robert Tarallo, who handled corrupt appraisals of vehicles that were the subject of claims submitted to BOC, recruited defendant Seymour Ringle, who handled automobile damage appraisals for Transamerica, to join the fraudulent scheme. During the period from 1976 to 1979 Tarallo and Ringle had been part of an automobile insurance fraud group headed by Alphonse Di-Mola, which had operated in much the same fashion as the later scheme charged in the present case. In the earlier scheme Robert Jarmel and Jeff Cohen, brokers employed by Claridge Brokers, filed AIP applications which were routed by Boutelle to specific insurers. Tarallo and Ringle performed the fraudulent appraisals for DiMola. In 1981 and 1982 Jarmel and Cohen filed fraudulent AIP applications for a partially new group, D'Ambra and Tarallo, arranging with Boutelle to have the applications assigned to Transamerica, for which Ringle was the appraiser, with the result that many fraudulent claims were filed under the policies with Transamerica and paid by it after receiving fraudulent appraisals submitted by Ringle. Although these appraisals were represented as having been performed at specified collision shops, the owners of the shops and D'Ambra's secretary, who had pleaded guilty to one mail fraud count, testified that the automobiles for which the damage claims were made had never been in the shops and that Ringle had never made the appraisals.

A looseleaf notebook seized in the summer of 1981 from Joseph Burruezo ("Joe Savage"), who performed fraudulent appraisals of claims submitted to USF & G and Michigan, contained a list of appraisers, including Ringle, opposite whose name was an entry, "$200," plus a description of a Transamerica policy and claim with a notation that payment had been made to

Ringle. Photographs of a damaged 1980 Audi automobile submitted by Ringle with his appraisal to Transamerica were identical to those submitted by Tarallo to BOC for the same damage to the same car. On a number of occasions Ringle appraised the same auto as an insured on one claim and as a claimant on another. He submitted appraisals of different claims of the same damage to the same auto within a few months.

Defendant Pasquale Panza, whose brother was engaged to Tarallo's daughter, permitted his Corvette automobile to be used for obtaining successive AIP policies which were then assigned to GA and BOC, successively, and became the subject of two fraudulent accident claims and appraisals followed by a claim of theft. Panza testified in his own defense that he did not know of the fraudulent accident claims but admitted having had the photographs of the Corvette submitted with the applications for AIP insurance taken and could not explain the photographs of the same car's license plate submitted with the accident claims. He further testified that his Corvette had been stolen and that he had submitted both sets of keys to the insurer, although only one set was received. He admitted part ownership of a residence in Kerhonkson, New York, to which insurance claims by others were sent, and acknowledged familiarity with the "Panza Automobile Repair Shop," which had furnished a receipt for towing submitted on another claim figuring in the indictment.

The only defendants on trial who testified were Panza and Ringle. Merlino stipulated that he was on vacation on May 13, 1980, which had been testified to by Weingarten as the date when he delivered certain AIP applications to Merlino at his home.

Ringle testified that he was unaware that claims of damage appraised by him were fraudulent. He stated that payments received by him were for prompt service rather than for the making of fraudulent appraisals. When he was confronted on

cross-examination with documents showing that on a number of occasions he had appraised the same car twice within a short time in support of different claims, that he had appraised the same car as an insured auto and later as a claimant car within a few months, that he had appraised different cars for owners at the same address within a short time, that he had submitted identical photographs of a 1980 Audi to two different insurers within approximately two months, he testified that he had been too busy and careless to spot this evidence of fraud.

### DISCUSSION

As frequently occurs in multiple-defendant conspiracies and mail frauds extending over a long period and involving numerous transactions, many different claims of error are raised on this appeal. Some are raised by more than one appellant while others pertain to one defendant only. The following errors are claimed by more than one of the appellants: (1) failure to grant a bill of particulars; (2) failure to sever the trials of Merlino and Panza; (3) insufficiency of the evidence of guilty knowledge and intent; and (4) evidentiary errors, including (a) admission of documents as regular business records that did not qualify as such, and as evidence of "prior similar acts," and (b) admission of notebooks in violation of the Hearsay Rule. Defendant Boutelle objects to (a) the seizure of documents from his home in violation of his Fourth Amendment rights; and (b) the elicitation of a post-arrest admission from him regarding a marking on insurance applications, in violation of his right to counsel.

### The Failure to Grant a Bill of Particulars

Defendants Panza and Ringle argue that the indictment failed to set forth properly all of the elements of the crimes charged against them or to inform them sufficiently of the charges to enable them to prepare their defenses. The trial court, they contend, therefore erred in not granting their motion for a bill of particulars. We disagree.

The mail fraud charges in the indictment fully complied with the requirement that it set forth the essential elements and facts needed to inform the defendants of the charges, thus enabling them to defend and to plead an acquittal or conviction in bar of any future prosecution for the same offenses. Fed.R.Crim.P. 7(c); *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *United States v. Chestnut*, 533 F.2d 40, 45 (2d Cir.), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976). Whether to grant a bill of particulars rests within the sound discretion of the district court. *United States v. Burgin*, 621 F.2d 1352, 1358–59 (5th Cir.), *cert. denied*, 449 U.S. 1015, 101 S.Ct. 574, 66 L.Ed.2d 474 (1980). In the present case the denial of a bill was not an abuse of that discretion. The elements of the mail fraud scheme are described in detail in the indictment. (*See, e.g.*, Pars. 9–20, 141). Each mail fraud count spells out the conduct of the defendants in furtherance of the scheme. Each defendant was furnished by way of discovery the insurance files mentioned in the indictment and additional pertinent documents, including brokers' files, Dept. of Motor Vehicle records, and charts that were later introduced by the government. In addition, although the prosecutor was not required to do so, he met with defense counsel shortly after the filing of the indictment, explained the government's contentions regarding the basis of the alleged frauds and offered to provide the defendants with copies of all relevant documents. Indeed, every document introduced by the government at trial had been made available for inspection before trial. Thus, despite the involvement of about 150 separate fraud claims specified in the indictment, a reasonably diligent counsel was furnished with all information needed to prepare for trial.

### The Denial of a Severance to Merlino and Panza

Defendants Merlino and Panza contend that the district court erred in refusing to

sever their trials from that of the other defendants and that as a result they suffered a prejudicial spillover from evidence offered against the others. There is no claim that the joinder of the offenses and defendants did not meet the standards of Fed.R.Crim.P. 8.

■ Merlino waived any right he might have had to a severance under Fed. R.Crim.P. 14 by failing to request it before trial. Fed.R.Crim.P. 12(b)(2), 12(b)(5), and 12(f); *United States v. Beltempo*, 675 F.2d 472, 481 (2d Cir.), *cert. denied*, 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982). Panza, on the other hand, fails to make any showing that the district court abused its discretion in denying his Rule 14 motion. As we pointed out in *United States v. Sotomayor*, 592 F.2d 1219, 1228 (2d Cir.), *cert. denied*, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979):

> "... we are reluctant to overturn a conviction for denial of a motion for severance unless there is a showing of substantial prejudice. [Citations omitted] It is not sufficient merely to show that the accused would have had a better chance for acquittal at a separate trial."

It is almost inevitable that in an unlawful scheme or conspiracy involving several defendants some will be shown to have been more culpable than others. *United States v. Carson*, 702 F.2d 351, 366–67 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). But a defendant is not entitled to a severance simply because certain evidence may be admissible only against others. *United States v. Lyles*, 593 F.2d 182, 190 (2d Cir.), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). The defendant seeking a severance must shoulder the difficult burden of showing that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials. *United States v. Losada*, 674 F.2d 167, 171 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). Here the district judge's finding that Panza had not

made such a showing was reasonable and well within his discretion.

*The Sufficiency of the Evidence of Guilty Knowledge and Intent*

■ Appellants (except Fruscione and Cappello) contend that the evidence was insufficient to establish that each knowingly and actively participated in the alleged mail fraud scheme and racketeering enterprise and that each possessed the specific intent to defraud that is an essential element of the crime of mail fraud. *See United States v. Barta*, 635 F.2d 999, 1005 n. 14 (2d Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981) (mail fraud). We disagree. Fraudulent intent need not be proved by direct evidence. Indeed, it is often established by circumstantial evidence revealing a pattern of conduct or coordinated activities from which a rational person may infer beyond a reasonable doubt that a defendant joined the scheme or unlawful enterprise with knowledge of its unlawful objective, i.e., to defraud others. *See, e.g., United States v. Amrep Corp.*, 560 F.2d 539, 546 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978); *United States v. Simon*, 425 F.2d 796, 809 (2d Cir.1969), *cert. denied*, 397 U.S. 1006, 90 S.Ct. 1232, 25 L.Ed.2d 419 (1970). It is for the jury to determine the credibility of the evidence, which upon appeal must be considered by us in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and to draw such inferences from it as were reasonable. In the present case there was an abundance of evidence of guilty knowledge and intent on the part of each of the defendants.

■ Boutelle's guilty knowledge could rationally be inferred beyond a reasonable doubt from (1) the sheer volume of the AIP applications hand-assigned by him at the request of Jarmel and Cohen, which was inconsistent with mere customer preferences, (2) his acceptance of money bribes for making the hand-assignments, which indicated that the requests were for an improper purpose, (3) the limitation of the

requests to four or five insurers despite the large number of applications, which ran into the hundreds, (4) his recycling of the same names as insureds, a sign of fraud, and (5) his maintenance of daily lists of scores of his hand-assigned applications and the resulting policies, which meticulously recorded the insured's name, date of the assignment and the insurance company.

■ The evidence of Merlino's guilty knowledge was similar to that against Boutelle and equally sufficient to support a guilty verdict. In 1980 Merlino accepted money bribes from Weingarten for making more than 30 improper hand-assignments of applications prepared by Weingarten and William Cohen. The assignments were to the same handful of companies. By mid-1980 Merlino had twice within two months obtained insurance at Weingarten's request from specific insurers for the same person (Imbesi) for the same car (a 1979 Cadillac). Merlino's inquiry of Weingarten as to whether fraudulent claims were being filed under the policies obtained as a result of his hand-assignments, although answered in the negative, demonstrated his awareness of what was in fact happening, which was confirmed by the strong pattern of impropriety that had developed. The jury could reasonably infer that with all of these red flags flying he was conscious that he was playing a part in a fraudulent scheme, even though he may not have known all of the details. *United States v. Amrep, supra,* 560 F.2d at 546.

■ The proof of Ringle's guilt was so overwhelming as to necessitate little analysis. It included his reports in 1981 and 1982 that he had performed numerous appraisals at various auto body shops when in fact no such appraisals were made, his appraisals of the same car as the insured on one claim and as the claimant on another, and his performance of multiple appraisals of the same car and of different cars insured at the same address or in the same name. In addition to the sufficiency of the evidence introduced by the government to support a guilty verdict, the jury was entitled to take into account the incred-

ibility of Ringle's trial testimony in reaching a guilty verdict. *United States v. Singleton,* 532 F.2d 199, 204 (2d Cir.1976).

■ The evidence against Panza, although wholly circumstantial, was likewise sufficient to support the jury's guilty verdict. Despite his testimony that he was concerned about obtaining a cheaper insurance premium rate, he shifted the insurance from his usual broker and insurer (Prudential) to GA, which charged him a higher premium than Prudential. This transfer was done at the bidding of the father of his brother's fiancee, Robert Tarallo, himself involved in the fraudulent insurance scheme, who brought Panza to Robert Jarmel, a crooked insurance agent. Panza's application gave the same address as that used for other fraudulent AIP claims. Photos of the car used to support the first fraudulent claim could not be explained by Panza, and the claim check was sent to the location Panza had given. The insurance on the car was then moved through the fraudulent AIP hand-assignment system to BOC as insurer. Shortly thereafter the car was the subject of another fraudulent accident claim. Finally Panza reported to BOC that his insured Corvette had been stolen, for which Panza received the full value of the car on his representation that it had been driven only 1,000 miles. From all of these circumstances, coupled with the incredibility of Panza's trial testimony, *United States v. Singleton, supra,* the jury could reasonably infer that he had joined in the fraudulent scheme for gain.

### *The Trial Judge's Evidentiary Rulings*

#### (a) *Insurance company files*

As proof of the improper hand-assignment of applications to certain insurance companies, the issuance of policies by them, the payment of premiums, and the processing and payment of fraudulent claims under the policies, the government introduced into evidence the relevant insurance company files, which were authenticated by qualified representatives of the

companies involved. Each representative testified to his company's record-keeping practices and procedures and that each of the files was prepared and kept by the company in the regular course of its business. The files were then admitted into evidence pursuant to Fed.R.Evid. 803(6) as regular business records.

The trial court overruled objections to certain files on the ground that a few documents (e.g., a police report, a company form used to obtain certification of repairs) were missing. Under the circumstances, these rulings were not erroneous, since the minor incompleteness of the files went to the weight rather than to the admissibility of the evidence. *See Matador Drilling Co. v. Post,* 662 F.2d 1190, 1199 (5th Cir.1981). Nor did the court err in admitting files evidencing prior similar frauds in which Ringle did not directly participate; they were relevant and admissible to prove the general fraudulent scheme charged in the indictment. Documents seized from DiMola's auto body shop, including an appraisal prepared by Ringle for Raymond DeSicco in furtherance of the scheme, were admissible to refute Ringle's denial that he had any relationship with DiMola.

### (b) *The Burruezo-Fordin notebooks*

Defendant Fruscione's contention that the court erred in admitting under Fed.R.Evid. 801(d)(2)(E) notebooks and other documents seized from the hotel room of co-conspirators Burruezo and Donna Fordin upon their arrest, which were in the latter's handwriting and properly authenticated pursuant to Fed.R.Evid. 901, must be rejected. The writings were properly admitted as statements made by a co-conspirator during the course and in furtherance of the conspiracy. They contained numerous entries of fraudulent policies and appraisals, with identification of names, automobiles and addresses which matched insurance company files, and noted the payment of bribes of $100 each to Fruscione for hand-assigning to those companies applications for insurance policies needed to facilitate the filing of fraudulent claims. For the statement of an alleged co-conspirator to be used against a defendant, the government must establish by a fair preponderance of the independent non-hearsay evidence that the defendant was in fact a member of the conspiracy. *United States v. Terry,* 702 F.2d 299, 310 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Garcia-Duarte,* 718 F.2d 42, 45 (2d Cir.1983). In this case there was sufficient non-hearsay evidence of Fruscione's participation in the conspiracy, including the testimony of co-conspirators Maimin, Weingarten and Cohen, to warrant admission of the co-conspirators' statements against him.

### Boutelle's Claims

#### (a) *The documents seized from Boutelle's bedroom*

On July 7, 1982, Investigator Armand Yannone, armed with a warrant, entered Boutelle's home to arrest him. While waiting in the bedroom as Boutelle dressed in the bathroom Yannone recognized an AIP application and assignment card on Boutelle's dresser and, upon further examination of the papers, saw that they contained handwritten notations of names which he recognized as persons involved in the fraudulent claims alleged in the indictment. He thereupon seized the papers.

Boutelle contends that Judge Bramwell erred in denying his motion to suppress the evidence after an evidentiary hearing. The issue turns on whether the seizure was justified under the "plain view" doctrine enunciated in *Coolidge v. New Hampshire,* 403 U.S. 443, 468–71, 91 S.Ct. 2022, 2039–40, 29 L.Ed.2d 564 (1971), or resulted from an unlawful extension of the search into the area of exploration rather than inadvertent detection of evidence that could reasonably be associated with criminal activity, *Texas v. Brown,* 460 U.S. 730, 741–42, 103 S.Ct. 1535, 1542–43, 75 L.Ed.2d 502 (1983) (plurality opinion), which may include documents. *United States v. Mannino,* 635 F.2d 110, 115 (2d Cir.1980) (brief perusal of documents to determine their

relevance to crime justified); *United States v. Callabrass,* 607 F.2d 559, 564 (2d Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980) (permitting seizing officers to consider evidentiary value of items in context in which they were seized); *United States v. Ochs,* 595 F.2d 1247, 1257 n. 8 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

■ After hearing Yannone and Boutelle testify Judge Bramwell credited the former's testimony and rejected that of Boutelle. Investigator Yannone testified that based on his participation in the investigation of the fraudulent scheme he had become familiar with AIP applications and other papers used. He recognized immediately the documents on Boutelle's dresser as an AIP application and assignment card, with papers bearing names of persons for whom fraudulent claims had been submitted to insurers. The court accordingly denied the motion to suppress these documents. Since Investigator Yannone, who was lawfully on the premises, thus inadvertently observed incriminating evidence in plain view, the district court's findings cannot be set aside as clearly erroneous, *United States v. Isom,* 588 F.2d 858, 861 (2d Cir.1978), and its refusal to suppress the evidence must be upheld.

(b) *Boutelle's post-indictment admission to a co-conspirator cooperating with the government*

After he had been indicted Boutelle, in response to a question from Robert Jarmel, who with Jeffrey Cohen had paid him bribes to hand-assign AIP applications so that fraudulent claims could be made, stated that some hand-assignments did not bear the letter "H" (hand-assign) on them because the "H" could be erased. At the time when this statement was made, Jarmel had entered into an agreement with the government under which, in return for his cooperation, including his implication of Boutelle in the fraudulent scheme, he would be permitted to plead guilty to one

count of mail fraud with a sentence of probation.

In the course of his testimony as a government witness Jarmel, to the government's surprise, related Boutelle's foregoing admission. When Boutelle objected on the ground that the evidence had been obtained in violation of his Sixth Amendment right to counsel, *United States v. Henry,* 447 U.S. 264, 270–71, 100 S.Ct. 2183, 2186–87, 65 L.Ed.2d 115 (1980), a hearing was held out of the jury's presence at which Jarmel testified that Boutelle had made the admission on a visit to Jarmel's home to borrow money and that in asking Boutelle the question that led to the admission Jarmel had acted simply out of curiosity and contrary to instructions from the government not to communicate with any of the defendants. Boutelle contends that Judge Bramwell's admission of the evidence constituted reversible error. We disagree.

■ Boutelle's Sixth Amendment right to counsel would be violated only if the government deliberately elicited the incriminating admission, *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), which would occur only if Jarmel acted on behalf of the government in obtaining the information. *United States v. Henry, supra,* 447 U.S. at 270, 100 S.Ct. at 2186. However, the surrounding circumstances in the present case all point in the opposite direction. Unlike the paid government informant in *Henry* Jarmel acted entirely on his own and not in response to any government solicitation. Indeed he acted contrary to the government's instructions and was not motivated by any payment or other consideration received from the government. *See United States v. Bennett,* 729 F.2d 923, 925 (2d Cir.1984) (refusing to suppress products of illegal search by government informant where informant had been given specific instructions against illegal search). Since Jarmel had already entered into a firm cooperation agreement binding the government to its terms, he stood to gain nothing from his conversation with Boutelle. Nor was Boutelle, unlike the defendant in *Hen-*

ry, in custody at the time when he made the admission to Jarmel; he was therefore free from any compulsion associated with incarceration. In view of these circumstances the conversation was not attributable to the government and did not violate Boutelle's Sixth Amendment rights. *United States v. Calder*, 641 F.2d 76, 78–79 (2d Cir.), *cert. denied*, 454 U.S. 843, 102 S.Ct. 156, 70 L.Ed.2d 128 (1981); *Thomas v. Cox*, 708 F.2d 132, 135–36 (4th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983).

### Miscellaneous Claims of Error

We have examined the other claims of error raised by appellants other than Cappello and find them to be without merit. The prosecutor's statement in his opening to the effect that he would prove that the defendants were a "gang of thieves" did not exceed the bounds of propriety, since this is essentially what was proved. Detective Purcell's testimony that he had for years been assigned to the Police Department's "Auto Crime Division of the Organized Crime Control Bureau" was relevant to his credibility as an expert. Burruezo's description of the defendants as the "family," according to Weingarten's testimony, was admissible as a statement in furtherance of the conspiracy. The court's limitations on Ringle's cross-examination of BOC representative Smith and of Transamerica's Yeager were reasonable under the circumstances and well within the judge's discretion. Indeed, some of the testimony sought to be elicited from Yeager would have violated the Hearsay Rule. The government properly argued in its rebuttal summation, after a defendant had asked the jury to infer from the government's failure to call certain witnesses that they would not have been helpful to it, that the witnesses were equally available to be subpoenaed by the defendants, from which the jury could infer that they would not have been helpful to the defendants. *United States v. Bubar*, 567 F.2d 192, 199 (2d Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977); *United States v. Rodriguez*, 545 F.2d 829, 832 (2d Cir.

1976), *cert. denied*, 434 U.S. 819, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977); *United States v. Ploof*, 464 F.2d 116, 119 (2d Cir.), *cert. denied sub nom. Godin v. United States*, 409 U.S. 952, 93 S.Ct. 298, 34 L.Ed.2d 224 (1972).

### The Lawfulness of the Sentence Imposed on Gregory Cappello

Gregory Cappello, who pleaded guilty to one mail fraud count and was sentenced to three years imprisonment, appeals his resulting conviction on the ground that the sentence constituted "cruel and unusual" punishment. We disagree.

The three-year sentence was well within the five-year permissible statutory maximum. Although Cappello was not an organizer of the fraudulent scheme and his participation in it was less than that of some of his co-defendants, it was nevertheless a serious involvement—the provision of names and addresses for cars to be insured and assistance in receiving mail and in cashing checks received from insurers in payment of fraudulent claims. Unlike some of his co-defendants he had a prior criminal record, including adjudication as a youthful offender based on unlawful possession of a gun and a subsequent conviction for unlawful gun possession. Judge Bramwell further found that he had not responded to earlier attempts to rehabilitate him. These factors lay within the sentencing judge's broad discretion, 18 U.S.C. § 3577; *Roberts v. United States*, 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980). The circumstances here, including the court's individualized consideration of Cappello's participation and background, render wholly inapposite the Supreme Court's recent decision in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 3016, 77 L.Ed.2d 637 (1983), where the gross disproportionality of the sentence was readily apparent. No such showing is made here.

Nor has Cappello shown that his sentence was illegally imposed, was based on impermissible factors or incorrect informa-

tion, or was imposed in violation of constitutional or statutory procedural safeguards. *See, e.g., Townsend v. Burke,* 334 U.S. 736, 740–41, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948); *United States v. Mennuti,* 679 F.2d 1032, 1037 (2d Cir.1982); *United States v. Rosner,* 485 F.2d 1213, 1231 (2d Cir.1973), *cert. denied,* 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974). His sentence is therefore a classic example of a conviction that is not entitled to appellate review. *Dorszynski v. United States,* 418 U.S. 424, 431, 94 S.Ct. 3042, 3047, 41 L.Ed.2d 855 (1974).[1]

The judgments of conviction are affirmed.

Pierce, Circuit Judge, dissented and filed opinion.

---

**1.** On July 10, 1984, defendant Ringle filed a motion in the district court pursuant to Fed.R. Crim.P. 33 for a new trial, which Judge Bramwell denied on the ground that the district court had been deprived of jurisdiction by reason of the pending appeal of his case before this court. Thereupon, on August 8, 1984, Ringle filed with this court a motion, purportedly pursuant to Rule 33, for a new trial on grounds of newly discovered evidence, for an investigation of the grand jury proceedings that led to the indictment in the present case and for a remand of the case, which was referred to this panel. The supporting papers consist of a rambling, obscure and disconnected discourse with respect to the government's alleged use of irrelevant evidence before the grand jury and alleged inadequacies in the government's disclosures to Ringle.

Having affirmed Ringle's conviction, we deny the motion without prejudice to its being renewed upon return of the case to the district court which was powerless to consider it during the pendency of Ringle's appeal. *United States v. Katsougrakis,* 715 F.2d 769, 776 (2d Cir.1983); *United States v. Warren,* 453 F.2d 738 (2d Cir. 1972).