**UNITED STATES of America,**

v.

**Ahmed Abdel SATTAR, a/k/a "Abu Omar," a/k/a "Dr. Ahmed," Yassir Al–Sirri, a/k/a "Abu Ammar," Lynne Stewart, and Mohammed Yousry, Defendants.**

**No. 02 CR. 395(JGK).**

United States District Court, S.D. New York.

July 22, 2003.

Robin L. Baker, Christopher J. Morvillo, Anthony S. Barkow, Jennifer G. Rodgers, Jessica A. Roth, Asst. U.S. Attys., James B. Comey, U.S.Atty., S.D.N.Y., for Plaintiff.

Barry M. Fallick, Kenneth Paul, Bobbi C. Sternheim, Jillian S. Harrington, Rochman Platzer Fallick & Sternheim, LLP, New York City, for Defendant Sattaro.

Michael E. Tigar, Jane B. Tigar, Steven P. Ragland, The Tigar Law Firm, Annapolis, MD, for Defendant Stewart.

David Stern, Rothman, Schneider, Soloway & Stern, P.C., New York City, for Defendant Yousry.

### OPINION AND ORDER

KOELTL, District Judge.

The defendants in this case—Ahmed Abdel Sattar, a/k/a "Abu Omar," a/k/a "Dr. Ahmed" ("Sattar"), Yassir Al–Sirri, a/k/a "Abu Ammar" ("Al–Sirri"), Lynne Stewart ("Stewart") and Mohammed Yousry ("Yousry")—were charged in a five-count indictment on April 8, 2002 ("Indictment"). The First Count of the Indictment charges Sattar, Al–Sirri, Stewart and Yousry, together with others known and unknown with conspiring to provide material support and resources to a foreign terrorist

organization ("FTO") in violation of 18 U.S.C. § 2339B. Count Two charges each of the defendants with providing and attempting to provide material support and resources to an FTO in violation of 18 U.S.C. §§ 2339B and 2. Count Three charges Sattar and Al–Sirri with soliciting persons to engage in crimes of violence in violation of 18 U.S.C. § 373. Count Four charges Sattar, Stewart and Yousry with conspiring to defraud the United States in violation of 18 U.S.C. § 371. Finally, Count Five charges Stewart with making false statements in violation of 18 U.S.C. §§ 1001 and 2. Defendants Sattar, Stewart and Yousry now move to dismiss the Indictment on various grounds.[1]

## I.

The Indictment alleges the following facts. At all relevant times, the Islamic Group, a/k/a "Gama'a al-Islamiyya," a/k/a/ "IG," a/k/a "al-Gama'at," a/k/a "Islamic Gama'at," a/k/a/ "Egyptian al-Gama'at al Islamiyya," ("IG"), existed as an international terrorist group dedicated to opposing nations, governments, institutions, and individuals that did not share IG's radical interpretation of Islamic law. (Ind.¶ 1.) IG considered such parties "infidels" and interpreted the concept of "jihad" as waging opposition against infidels by whatever means necessary, including force and violence. (Ind.¶ 1.) IG regarded the United States as an infidel and viewed the United States as providing essential support to other infidel governments and institutions, particularly Israel and Egypt. (Ind.¶ 2.) IG also opposed the United States because the United States had taken action to thwart IG, including by the arrest, conviction, and continued confinement of its spiritual leader Omar Ahmad Ali Abdel Rahman, a/k/a "Omar Ahmed Ali," a/k/a "Omar Abdel Al–Rahman," a/k/a "The

Sheikh," a/k/a "Sheikh Omar" ("Sheikh Abdel Rahman"). (Ind.¶ 2.)

IG has allegedly operated in the United States from the early 1990s until the date of the filing of the Indictment, particularly in the New York metropolitan area. (Ind. ¶ 12.) According to the Indictment, IG's objectives in the United States include (1) the establishment of the United States as a staging ground for violent acts against targets in the United States and abroad; (2) the recruitment and training of members; and (3) fundraising for jihad actions in the United States and overseas. (Ind.¶ 12.) Since Sheikh Abdel Rahman's imprisonment, the Indictment alleges that IG members in the United States have also functioned as a worldwide communications hub for the group, in part by facilitating communications between IG leaders and Sheik Abdel Rahman. (Ind.¶ 12.) IG was designated as a foreign terrorist organization by the Secretary of State on October 8, 1997 pursuant to Title 8, United States Code, Section 1189 and was redesignated as such on October 8, 1999 and again on October 5, 2001. (Ind.¶ 18.)

The Indictment alleges that Sheikh Abdel Rahman has been one of IG's principal leaders and a high-ranking member of jihad organizations based in Egypt and elsewhere since the early 1990s. (Ind.¶ 4.) Sheikh Abdel Rahman allegedly became an "emir" or leader of IG in the United States. (Ind.¶ 4.) Under his leadership, IG subordinates carried out the details of specific jihad operations while shielding Sheikh Abdel Rahman from prosecution. (Ind.¶ 4.) The Indictment charges that Sheik Abdel Rahman, among other things, provided guidance about what actions, including acts of terrorism, were permissible or forbidden under his interpretation of Islamic law; gave strategic advice on how to achieve IG's goals; recruited persons

---

**1.** Defendant Al–Sirri is in England and takes no part in these motions.

and solicited them to commit violent jihad acts; and sought to protect IG from infiltration by law enforcement. (Ind.¶ 4.)

Sheikh Abdel Rahman was convicted in October 1995 of engaging in a seditious conspiracy to wage a war of urban terrorism against the United States, including the 1993 World Trade Center bombing and a plot to bomb New York City landmarks. (Ind.¶ 5.) He was also found guilty of soliciting crimes of violence against the United States military and Egyptian President Hosni Mubarak. (Ind.¶ 5.) In January 1996 Sheik Abdel Rahman was sentenced to life imprisonment plus 65 years. (Ind. ¶ 5.) His conviction was affirmed on appeal and, on January 10, 2000, the United States Supreme Court denied his petition for a writ of certiorari. (Ind.¶ 5.)

Sheikh Abdel Rahman has been incarcerated at the Federal Medical Center in Rochester, Minnesota since in or about 1997. (Ind.¶ 5.) IG has allegedly taken repeated steps to win Sheikh Abdel Rahman's release. (Ind.¶¶ 8–11.) Such steps include the issuance of a statement in response to Sheikh Abdel Rahman's life sentence that warned that "[a]ll American interests will be legitimate targets for our struggle until the release of Sheikh Omar Abdel Rahman and his brothers" and that IG "swears by God to its irreversible vow to take an eye for an eye." (Ind.¶ 8.) Also, on or about November 17, 1997, six assassins shot and stabbed a group of tourists at an archeological site in Luxor, Egypt killing fifty-eight tourists and four Egyptians. (Ind.¶ 9.) Before exiting, the Indictment charges, the assassins scattered leaflets calling for Sheikh Abdel Rahman's release and inserted one such leaflet into the slit torso of one victim. (Ind.¶ 9.)

The Bureau of Prisons, at the direction of the Attorney General, imposed Special Administrative Measures ("SAMs") upon Sheikh Abdel Rahman. (Ind.¶ 6.) The SAMs limited certain privileges in order to protect " 'persons against the risk of death or serious bodily injury' that might otherwise result." (Ind.¶ 6.) The limitations included restrictions on Sheikh Abdel Rahman's access to the mail, the telephone, and visitors, and prohibited him from speaking with the media. (Ind.¶ 6.) All Counsel for Sheik Abdel Rahman were obligated to sign an affirmation acknowledging that they and their staff would abide fully by the SAMs before being allowed access to their client. (Ind.¶ 6.) In the affirmation, counsel agreed to "only be accompanied by translators for the purpose of communicating with the inmate Abdel Rahman concerning legal matters." (Ind.¶ 7.) Since at least in or about May 1998, counsel agreed not to use "meetings, correspondence, or phone calls with Abdel Rahman to pass messages between third parties (including, but not limited to, the media) and Abdel Rahman." (Ind.¶ 7.)

Defendant Stewart was Sheikh Abdel Rahman's counsel during his 1995 criminal trial and has continued to represent him since his conviction. (Ind.¶ 16.) The Indictment alleges that over the past several years, Stewart has facilitated and concealed messages between her client and IG leaders around the world in violation of the SAMs limiting Sheik Abdel Rahman's communications from prison. (Ind.¶ 16.) During a May 2000 visit to Sheikh Abdel Rahman in prison, Stewart allegedly allowed defendant Yousry, who acted as the Arabic interpreter between Sheikh Abdel Rahman and his attorneys, to read letters from defendant Sattar and others regarding IG matters and to discuss with her client whether IG should continue to comply with a cease-fire that had been supported by factions within IG since in or about 1998. (Ind.¶¶ 15–16.) According to the Indictment, Yousry provided material support and resources to IG by covertly passing messages between IG representatives and Sheik Abdel Rahman regarding

IG's activities. (Ind.¶ 15.) The Indictment alleges that Stewart took affirmative steps to conceal the May 2000 discussions from prison guards and subsequently, in violation of the SAMs, announced to the media that Sheikh Abdel Rahman had withdrawn his support for the cease-fire. (Ind.¶ 16.) The Indictment charges that in or about May 2000 Stewart submitted an affirmation to the United States Attorney's Office for the Southern District of New York (the "May Affirmation") that falsely stated, among other things, that she agreed to abide by the terms of the SAMs applicable to Sheikh Abdel Rahman and that she would not use her meetings, correspondence or phone calls with Sheikh Abdel Rahman to pass messages between Sheikh Abdel Rahman and third parties including but not limited to the media. (Ind.¶ 30.)

The Indictment also charges that Sattar is an active IG leader who serves as a vital link between Sheik Abdel Rahman and the worldwide IG membership. (Ind.¶ 13.) The Indictment contends that Sattar operates as a communications center for IG from New York City through frequent telephonic contact with IG leaders around the world. (Ind.¶ 13.) More specifically, the Indictment alleges that Sattar provides material support and resources to IG by relaying messages between IG leaders abroad and Sheik Abdel Rahman through visits and phone calls by Sheikh Abdel Rahman's interpreter and attorneys; arranging and participating in three-way phone calls connecting IG leaders around the world to facilitate discussion and coordination of IG activities; passing messages and information from one IG leader and to other group leaders and members; and by providing financial support. (Ind.¶ 13.)

Defendant Al–Sirri was arrested in the United Kingdom in October 2001 until which time, the Indictment alleges, he was the head of the London-based Islamic Observation Center. (Ind.¶ 14.) The Indictment charges that Al–Sirri, like Sattar, facilitated IG communications worldwide and provided material support and resources, including financial support, to the FTO. (Ind.¶ 14.) Al–Sirri was allegedly in frequent telephone contact with Sattar and other IG leaders regarding the dissemination of IG statements on various issues. (Ind.¶ 14.)

The defendants make the following motions.[2] Sattar and Stewart move to dismiss Counts One and Two on the ground that 18 U.S.C. § 2339B is unconstitutionally vague and overbroad.[3] Sattar and Stewart also argue that these counts should be dismissed because the designation of IG as an FTO was unconstitutional and provides no way for a criminal defendant to challenge that designation. Stewart moves to dismiss all counts against her on the ground that the Government lacks authority to enforce the SAMs underlying her prosecution. Sattar moves to dismiss Count Three for failure to allege the essential elements of the offense charged with sufficient factual detail. Stewart moves to dismiss Count Five of the Indictment because she contends that the May Affirmation is an insufficient basis for a false-statement prosecution pursuant to 18 U.S.C. § 1001. Stewart and Sattar both seek severance and bills of particulars. Stewart moves to dismiss Counts One,

---

**2.** The defendants' motions with regard to the suppression of evidence obtained through the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.*, will be addressed in a subsequent opinion.

**3.** Yousry specifically joins in Sattar's motion on this ground and joins in Stewart's motions to the extent they are applicable while reserving his right to move for severance pursuant to Federal Rule of Civil Procedure 14 at a later time.

Two, and Four as duplicitous. And finally, Stewart seeks an evidentiary hearing to determine whether the Government entered into a non-prosecution agreement that would preclude her prosecution under the Indictment.

## II.

Title 18, United States Code, Section 2339B provides, in relevant part:

> Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be [guilty of a crime].

18 U.S.C. § 2339B(a)(1). At all relevant times, "material support or resources" was defined as:

> currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

18 U.S.C. §§ 2339A(b) & 2339B(g)(4).[4]

A foreign "terrorist organization" is defined as "an organization designated" under 8 U.S.C. § 1189 as a foreign "terrorist organization." 18 U.S.C. § 2339B(g)(6).

Section 2339B, which is alleged to have been violated in this case, requires only that a person "knowingly" "provides" "material support or resources" to a "foreign terrorist organization." Section 2339A criminalizes the provision of "material support or resources" "knowing or intending that they are used in preparation for, or in carrying out," a violation of various criminal statutes. No such specific criminal intent provision is included in § 2339B.

Section 2339A defines "material support or resources" as indicated above. That definition includes no amount or other measure of magnitude and is carried over into § 2339B.

The Indictment alleges that the defendants conspired to provide and provided communications equipment, personnel, currency, financial securities and financial services (currency, financial securities, and financial services hereinafter "currency"), and transportation to IG. (Ind.¶¶ 20(a)-(d), 23.)

### A.

The defendants argue that 18 U.S.C. § 2339B is unconstitutionally vague specifically with regard to the statute's prohibition on "providing" material support or resources in the form of "communications equipment" and "personnel." With respect to communications equipment, the Indictment alleges, among other things, that "the defendants and the unindicted co-conspirators provided communications equipment and other physical assets, including telephones, computers and telefax machines, owned, operated and possessed by themselves and others, to IG, in order to transmit, pass and disseminate messages, communications and information between and among IG leaders and members in the United States and elsewhere around the world...." (Ind.¶ 20(a).) The Government has argued that the defendants provided a communications pipeline by which they transmitted messages from Sheikh Abdel Rahman in prison to IG leaders and members throughout the world. Among the specific instances of the use of communications equipment, the Indictment points to the fact that Sattar had telephone con-

---

**4.** Pub.L. No. 107–56, § 805(a)(2), Oct. 26, 2001, 115 Stat. 377, 380, 381, modified the definition of "material support or resources" to include monetary instruments and expert advice or assistance. The parties agree that the modified definition of "material support or resources" does not apply retroactively to the conduct charged in the Indictment.

versations with IG leaders in which he related Sheikh Abdel Rahman's instructions to IG leaders and Stewart released Sheikh Abdel Rahman's statement to the press in which Sheikh Abdel Rahman withdrew his support from the then-existing cease-fire. (Ind. ¶¶ 21(j)-(k).) With respect to the provision of personnel, the Indictment alleges that "the defendants and the unindicted co-conspirators provided personnel, including themselves, to IG, in order to assist IG leaders and members in the United States and elsewhere around the world, in communicating with each other...." (Ind.¶ 20(b).) The defendants argue that the statute fails to provide fair notice of what acts are prohibited by the prohibition against the provision of "communications equipment" and "personnel."

 A criminal statute implicating First Amendment rights "must 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *United States v. Rahman,* 189 F.3d 88, 116 (2d Cir.1999) (quoting *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)). "In short, the statute must give notice of the forbidden conduct and set boundaries to prosecutorial discretion." *United States v. Handakas,* 286 F.3d 92, 101 (2d Cir.2002). When analyzing a vagueness challenge, "[a] court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *Chatin v. Coombe,* 186 F.3d 82, 87 (2d Cir.1999) (quoting *United States v. Strauss,* 999 F.2d 692, 697 (2d Cir.1993)); *see also Handakas,* 286 F.3d at 111 ("The principle that a statute must provide both 'notice' and 'explicit standards' to survive an 'as-applied' constitutional challenge based on vagueness is well

established."). A "void for vagueness" challenge does not necessarily mean that the statute could not be applied in some cases but rather that, as applied to the conduct at issue in the criminal case, a reasonable person would not have notice that the conduct was unlawful and there are no explicit standards to determine that the specific conduct was unlawful. *See Handakas,* 286 F.3d at 111–12; *Chatin,* 186 F.3d at 87.

██ First, with regard to the "provision" of "communications equipment," Sattar and Stewart argue that the Indictment charges them with merely talking and that the acts alleged in the Indictment constitute nothing more than using communications equipment rather than providing such equipment to IG. For example, the Indictment charges Sattar with participating in and arranging numerous telephone calls between IG leaders in which IG business was discussed, including the need for "a second Luxor." (Ind.¶ 21(w).) The Indictment describes numerous other telephone calls in which Sattar participated. (*See, e.g.,* Ind. ¶¶ 21(cc)-(gg).) Stewart is charged with, among other things, providing communications equipment to IG by announcing Sheikh Abdel Rahman's withdrawal of support for the cease-fire in Egypt and thereby making the statements of the otherwise isolated leader available to the media. (Ind.¶ 21(k).)

The defendants look to the legislative history of the statute as evidence that Congress did not intend § 2339B to criminalize the mere use of communications equipment, rather than the actual giving of such equipment to IG. The legislative history states:

The ban does not restrict an organization's or an individual's ability to freely express a particular ideology or political philosophy. Those inside the United States will continue to be free to advo-

cate, think and profess the attitudes and philosophies of the foreign organizations. *They are simply not allowed to send material support or resources to those groups, or their subsidiary groups, overseas.*

H.R. Rep. 104–383 at 45 (emphasis added). Thus, the defendants argue, simply making a phone call or similarly communicating one's thoughts does not fall within the ambit of § 2339B.

The defendants are correct and by criminalizing the mere use of phones and other means of communication the statute provides neither notice nor standards for its application such that it is unconstitutionally vague as applied. The Government argued in its brief that the defendants are charged not merely with using their own phones or other communications equipment but with actively making such equipment available to IG and thus "providing" IG with communications resources that would otherwise be unavailable to the FTO. That argument, however, simply ignores the reality of the facts charged in the Indictment in which various defendants are accused of having participated in the use of communications equipment. The Government subsequently changed course and stated at oral argument that the mere use of one's telephone constitutes criminal behavior under the statute and that, in fact, "use equals provision." (Transcript of Oral Argument dated June 13, 2002 ("Hearing Tr.") at 53, 65.) The Government also argued that using the conference call feature on a person's phone in furtherance of an FTO was prohibited. (*Id.* at 65.)

Such changes in the Government's interpretation of § 2339B demonstrate why the provision of communications equipment as charged in the Indictment is unconstitutionally vague: a criminal defendant simply could not be expected to know that the conduct alleged was prohibited by the stat-ute. *See Handakas,* 286 F.3d at 104 ("a penal statute must speak for itself so that a lay person can understand the prohibition"). The defendants were not put on notice that merely using communications equipment in furtherance of an FTO's goals constituted criminal conduct. Moreover, the Government's evolving definition of what it means to provide communications equipment to an FTO in violation of § 2339B reveals a lack of prosecutorial standards that would "permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender,* 461 U.S. at 358, 103 S.Ct. 1855(quoting *Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974)); *accord Handakas,* 286 F.3d at 107. For these reasons, § 2339B is void for vagueness as applied to the allegations in the Indictment.

Second, the defendants argue, § 2339B is unconstitutionally vague as applied to the allegations in the Indictment relating to the "provision" of "personnel." The defendants urge the Court to follow the Ninth Circuit Court of Appeals' decision in *Humanitarian Law Project v. Reno,* 205 F.3d 1130, 1137 (9th Cir.2000), which found that "[i]t is easy to see how someone could be unsure about what [§ 2339B] prohibits with the use of the term 'personnel,' as it blurs the line between protected expression and unprotected conduct." The Court of Appeals thus affirmed the district court's finding that the use of the term "personnel" in § 2339B was unconstitutionally vague.

The Government relies on *United States v. Lindh,* 212 F.Supp.2d 541, 574 (E.D.Va. 2002), which rejected *Humanitarian Law Project* and found that the alleged plain meaning of personnel—"an employment or employment-like relationship between the persons in question and the terrorist organization"—gave fair notice of what con-

duct is prohibited under the statute and thus was not unconstitutionally vague. In that case, the court rejected a vagueness challenge in the context of a person who joined certain foreign terrorist organizations in combat against American forces. In defining the reach of the term personnel, the court found that it was not vague because it applied to "employees" or "employee-like operatives" or "quasi-employees" who work under the "direction and control" of the FTO. *Lindh*, 212 F.Supp.2d at 572–73. Whatever the merits of *Lindh* as applied to a person who provides himself or herself as a soldier in the army of an FTO, the standards set out there are not found in the statute, do not respond to the concerns of the Court of Appeals in *Humanitarian Law Project*, and do not provide standards to save the "provision" of "personnel" from being unconstitutionally vague as applied to the facts alleged in the Indictment. The fact that the "hard core" conduct in *Lindh* fell within the plain meaning of providing personnel yields no standards that can be applied to the conduct by alleged "quasi-employees" in this case. *Cf. Broadrick v. Oklahoma*, 413 U.S. 601, 608, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ("... even if the outermost boundaries of [the statute] may be imprecise, any such uncertainty has little relevance here, where appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions....")

It is not clear from § 2339B what behavior constitutes an impermissible provision of personnel to an FTO. Indeed, as the Ninth Circuit Court of Appeals stated in *Humanitarian Law Project*, "Someone who advocates the cause of the [FTO] could be seen as supplying them with personnel." *Humanitarian Law Project*, 205 F.3d at 1137. The Government accuses Stewart of providing personnel, including herself, to IG. In so doing, however, the Government fails to explain how a lawyer, acting as an agent of her client, an alleged

leader of an FTO, could avoid being subject to criminal prosecution as a "quasi-employee" allegedly covered by the statute. At the argument on the motions, the Government expressed some uncertainty as to whether a lawyer for an FTO would be providing personnel to the FTO before the Government suggested that the answer may depend on whether the lawyer was "house counsel" or an independent counsel—distinctions not found in the statute. (Hearing Tr. at 61–62.)

The Government concedes that the statute does not prohibit mere membership in an FTO, and indeed mere membership could not constitutionally be prohibited without a requirement that the Government prove the defendants' specific intent to further the FTO's unlawful ends. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) ("For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims."); *see also Boim v. Quranic Literacy Inst. and Holy Land Fnd. for Relief and Dev.*, 291 F.3d 1000, 1021–24 (7th Cir.2002). The Government attempts to distinguish the provision of "personnel" by arguing that it applies only to providing "employees" or "quasi-employees" and those acting under the "direction and control" of the FTO. But the terms "quasi-employee" or "employee-like operative" or "acting at the direction and control of the organization" are terms that are nowhere found in the statute or reasonably inferable from it.

Moreover, these terms and concepts applied to the prohibited provision of personnel provide no notice to persons of ordinary intelligence and leave the standards for enforcement to be developed by the Government. When asked at oral argu-

ment how to distinguish being a member of an organization from being a quasi-employee, the Government initially responded "You know it when you see it." (Hearing Tr. at 58.) While such a standard was once an acceptable way for a Supreme Court Justice to identify obscenity, *see Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J. concurring), it is an insufficient guide by which a person can predict the legality of that person's conduct. *See Handakas,* 286 F.3d at 104 ("It is not enough to say that judges can intuit the scope of the prohibition if [the defendants] could not.")

Moreover, the Government continued to provide an evolving definition of "personnel" to the Court following oral argument on this motion. Added now are "those acting as full-time or part-time employees or otherwise taking orders from the entity" who are therefore under the FTO's "direction or control." (Gov. Letter dated June 27, 2003 at 2 n. 1 ("Gov. June 27 Letter") (quoting the United States Attorneys' Manual definition of "personnel").)

The Government argues, moreover, that the Court should construe the statute to avoid constitutional questions. However, the Court "is not authorized to rewrite the law so it will pass constitutional muster." *Humanitarian Law Project,* 205 F.3d at 1137–38 (rejecting Government's suggestion to construe "personnel" as used in § 2339B as "under the direction or control" of an FTO). The Government also suggested at oral argument that perhaps a heightened scienter standard should be read into the statute, in some circumstances, in defining the provision of personnel. (Hearing Tr. at 62–64.) But that specific intent is not contained in the statute and thus could not give notice to persons about their allegedly prohibited conduct. Moreover, the Government subsequently withdrew its suggestion after oral argument. (Gov. June 27 Letter at 3 n. 3.) The statute's vagueness as applied to the allegations in the Indictment concerning the provision of personnel is a fatal flaw that the Court cannot cure by reading into the statute a stricter definition of the material support provision than the statute itself provides. *See Handakas,* 286 F.3d at 109–110 ("If the words of a criminal statute insufficiently define the offense, it is no part of deference to Congress for us to intuit or invent the crime.").

The Government now contends that if the Court finds that the terms "provision" of "communications equipment" or "provision" of "personnel" are unconstitutionally vague as applied to the defendants, the Court need not dismiss Counts One and Two of the Indictment. The Government argues that because the Grand Jury used the conjunctive form in charging the defendants with conspiring to provide and providing material support or resources in the form of communications equipment, personnel, currency *and* transportation, the necessary implication is that the Grand Jury would have returned the Indictment had the charges relating to personnel and communications equipment not been included. The Government relies on cases such as *United States v. Mastelotto,* 717 F.2d 1238, 1249 n. 10 (9th Cir.1983), in which the Ninth Circuit Court of Appeals explained: "... the failure of the jury instruction to require the jury to find the existence of a particular allegation of the indictment did not prejudice the defendant, since it was certain that, even without the deleted allegation, the grand jury would have indicted on the charge at issue." *See also United States v. Hobson,* 519 F.2d 765, 774 (9th Cir.1975). More recently, the Supreme Court made it clear that "[a]s long as the crime and the elements of the offense that sustain the con-

viction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). In *Miller*, the Supreme Court found that it was error to reverse a conviction where the trial court had dismissed one of three counts and the defendant was convicted of the remaining two counts even though the trial proof supported only a significantly narrower and more limited, though included, fraudulent scheme.

In this case, however, there is no reasonable way to redact the first two counts of the Indictment to excise the allegations relating to the conspiracy and related substantive offense of providing communications equipment and personnel to an FTO which are unconstitutionally vague as applied to the circumstances of this case. The Government has consistently presented its theory of the case in such a way that the allegations regarding the provision of personnel and communications equipment are not only central to the charges in Counts One and Two but also dwarf the allegations with respect to the provision of transportation and currency. The Government has painted a picture in the Indictment, at oral argument, and in its briefs, which the Government has said can be taken as a bill of particulars, of a communications pipeline staffed by the defendants that enabled Sheikh Abdel Rahman and other IG leaders around the world to communicate with one another. Allegations about the provision of currency and transportation play only a minuscule role in that plot. The number of overt acts relating to the provision of travel or cur-

rency is relatively small and none of them explicitly refer to Stewart or Yousry. Further, although Stewart and Yousry are charged in Count Two with substantive violations of § 2339B, and aiding and abetting, that Count provides no details but refers to the allegations in Count One, and there are no allegations in Count One that Stewart or Yousry provided currency or transportation to an FTO or aided and abetted such provision.

In this case, there is no reasonable way to redact the Indictment and charge only a conspiracy to provide currency and transportation or the related substantive offense. This is simply not a case where the elimination of counts or paragraphs can be done in such a way as to leave Counts One and Two of the Indictment as returned by the Grand Jury fundamentally intact. Cf. *Miller*, 471 U.S. at 145, 105 S.Ct. 1811 (one count struck from indictment did not broaden the indictment or violate defendant's right to be tried pursuant to indictment returned by grand jury); *United States v. Morrow*, 177 F.3d 272, 297 (5th Cir.1999) (deletion of alleged act did not modify essential elements of charged offense or broaden indictment and therefore "amendment" did not subject defendant to trial on charges not brought in indictment or change factual basis of indictment). For the reasons explained, Counts One and Two are therefore dismissed.[5]

**B.**

The defendants also argue that § 2339B is unconstitutionally overbroad and therefore Counts One and Two should be dismissed on that ground as well. However, § 2339B's prohibitions are content-neutral and its purpose of deterring

---

**5.** It should also be noted that, as discussed below, the Government concedes that certain other technical aspects of the Indictment will require that the Grand Jury be asked to re-

turn a superseding indictment. The Grand Jury should not be asked to return a superseding indictment that includes charges that are in part unconstitutional.

and punishing the provision of material support or resources to foreign terrorist organizations—a purpose aimed not at speech but at conduct—is, of course, legitimate. The Supreme Court has instructed that:

> facial overbreadth adjudication is an exception to our traditional rules of practice and [ ] its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interest in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.

*Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908. Therefore, "particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* The Supreme Court has recently reaffirmed this principle and explained that because "there are substantial social costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct.... we have insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications." *Virginia v. Hicks*, — U.S. —, —, 123 S.Ct. 2191, 2197, 156 L.Ed.2d 148, — (2003) (emphasis in original) (quoting *Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908). Therefore, § 2339B is not violative of the overbreadth doctrine unless the law, "*taken as a whole,* is substantially overbroad judged in relation to its plainly legitimate sweep." *Id.* at 2198 (emphasis in original).

Section 2339B prohibits the provision of material support or resources to an FTO in many forms, including currency, safehouses, false documentation or identification, weapons, lethal substances, explosives and other physical assets. *See* 18 U.S.C. §§ 2339A(b) & 2339B(g)(4). Prohibiting the supply of such tangible forms of material support is clearly a legitimate exercise of Congress' power. Indeed, the legislative history reflects a concentration on prohibiting "terrorist fundraising in the United States", H.R. Rep. 104–383 at 43, an aspect of the statute that has not been challenged on the present motions and which has appropriately been upheld against First Amendment challenges. *See Humanitarian Law Project*, 205 F.3d at 1133–35; *see also Boim*, 291 F.3d at 1026.

Judged in comparison to the law's plainly legitimate applications, the defendants have failed to meet their burden of demonstrating "from the text of [the law] and from actual fact that substantial overbreadth exists." *Hicks*, — U.S. at —, 123 S.Ct. at 2198 (internal quotation marks and punctuation omitted) (alteration in original). The defendants point to the possible application of the potentially broad definition of the provision of "personnel" and "communications equipment." But theses applications of the statute have not been shown to be a substantial part of the plainly legitimate scope of the statute. The motion to dismiss on overbreadth grounds is therefore denied.

### C.

■ The defendants also seek dismissal of Counts One and Two by making various challenges to the designation of IG as an FTO pursuant to 8 U.S.C. § 1189 as it affects their prosecution under § 2339B, particularly the provision of 8 U.S.C. § 1189(a)(8) that provides that a "defendant in a criminal action ... shall not be

permitted to raise any question concerning the validity of the issuance of such designation or redesignation as a defense or an objection at any trial or hearing."

Title 8, United States Code, Section 1189 authorizes the Secretary of State to designate an organization as an FTO if the Secretary finds that (1) the organization is a foreign organization; (2) that engages in terrorist activity or retains the capability or intent to engage in terrorist activity or terrorism; and (3) the organization's terrorist activity or terrorism threatens the security of United States nationals or the national security of the United States. 8 U.S.C. § 1189(a)(1)(A)-(C). In so doing, the Secretary must provide notice to Congressional leaders and publish the designation in the Federal Register seven days thereafter. 8 U.S.C. § 1189(a)(2)(A)(i)-(ii). In making a designation, the Secretary must create an administrative record and may consider classified information. 8 U.S.C. § 1189(a)(3)(A)-(B). A designation as an FTO is effective for a period of two years and the Secretary may redesignate a foreign organization as an FTO for additional two-year periods. 8 U.S.C. § 1189(a)(4)(A)-(B).

An organization designated as an FTO may seek judicial review of the designation in the United States Court of Appeals for the District of Columbia Circuit no later than 30 days after publication of the designation in the Federal Register. 8 U.S.C. § 1189(b)(1). Review is based solely on the administrative record, although the Government may submit classified information used in making the designation for ex parte and in camera review. 8 U.S.C. § 1189(b)(2). The reviewing court shall hold unlawful and set aside a designation that the court finds to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right; (4) lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court; or (5) not in accord with the procedures required by law. 8 U.S.C. § 1189(b)(3)(A)-(E). However, "a defendant in a criminal action ... shall not be permitted to raise any question concerning the validity of the issuance of such designation or redesignation as a defense or an objection at any trial or hearing." 8 U.S.C. § 1189(a)(8). In a prosecution under § 2339B the Government must prove that the defendant provided material support to an FTO, which is defined as a organization that has been so designated. 18 U.S.C. § 2339B(g)(5).

The defendants raise several objections to this statutory scheme. However, the defendants have not argued that delegation of the right to designate IG as an FTO to the Secretary of State violates the principles of separation of powers. This argument has been raised in other cases and correctly rejected by other courts. *See, e.g., Humanitarian Law Project,* 205 F.3d at 1137; *see also Touby v. United States,* 500 U.S. 160, 164–68, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991) (no violation of nondelegation doctrine when Congress delegated authority to Attorney General to designate drug as controlled substance); *United States v. Bozarov,* 974 F.2d 1037, 1041–45 (9th Cir.1992) (no violation of the nondelegation doctrine when Congress delegated listing on the Commodity Control List to Secretary of Commerce under the Export Administration Act).

The defendants urge the Court to follow *United States v. Rahmani,* 209 F.Supp.2d 1045 (C.D.Ca.2002), and dismiss Counts One and Two on the ground that the Indictment relies on a designation obtained in violation of due process. In *Rahmani,*

the court found that although the question of whether an organization was an FTO was an unreviewable political question, once the decision to designate had been made a court could scrutinize the designation procedure for conformance with the Constitution. *Id.* at 1051–52. The court then found that the Court of Appeals for the District of Columbia was not the sole venue for judicial review of a § 1189 designation. *Id.* at 1053–54. Having so determined, the court found that "Section 1189 violates the defendants' due process rights because defendants, upon a successful Section [2339B] prosecution, are deprived of their liberty based on an unconstitutional designation they could never challenge. Accordingly, I believe defendants may raise the constitutionality of Section 1189 as a defense...." *Id.* at 1054–55. Upon review of the statute, the court concluded that the pertinent provisions of § 1189

> admit of no other interpretation but that the organization to be designated is precluded from challenging the facts contained in the administrative record or presenting evidence to rebut the proposition that it is a terrorist organization. Such provisions are unconstitutional as violative of due process and render Section 1189 facially invalid.

*Id.* at 1058. "Therefore," the court found, "it follows that a designation pursuant to Section 1189 is a nullity since it is the product of an unconstitutional statute." *Id.*

*Rahmani* is not binding on this Court and is unpersuasive. First, the statute clearly provides a procedure by which IG can challenge its designation in the Court of Appeals for the District of Columbia. *See* 8 U.S.C. § 1189(b). Organizations designated as FTOs have availed themselves of this process. *See, e.g., People's Mojahedin Org. of Iran v. Dept. of State,* 327 F.3d 1238, 1241–44 (D.C.Cir.2003) (hereinafter *PMOI*) (no due process violation by Secretary of State when designat-

ing defendant as an FTO); *National Council of Resistance of Iran v. Dept. of State,* 251 F.3d 192, 209 (D.C.Cir.2001) ("Secretary must afford the limited due process available to putative foreign terrorist organization prior to the deprivation worked by designating that entity as such with its attendant consequences, unless he can make a showing of particularized need"); *People's Mojahedin Org. of Iran v. United States Dept. of State,* 182 F.3d 17, 21–25 (D.C.Cir.1999) (allowing judicial review of determination under § 1189 that organization is foreign and engages in terrorist activity but finding determination that such activity threatens the security of the United States under § 1189(a)(1)(C) a non-justiciable political question). The statute is equally explicit that a defendant in a criminal action may not raise any question of the validity of the designation as a defense or objection at any trial or hearing. *See* 8. U.S.C. § 1189(a)(8).

■ Moreover, the Government argues correctly that it is for IG, not the defendants, to raise IG's due process concerns before a court as provided for under the statute. Litigants, including the defendants, "never have standing to challenge a statute solely on the ground that it failed to provide due process to third parties not before the court." *Center for Reproductive Law and Policy v. Bush,* 304 F.3d 183, 196 (2d Cir.2002) (quoting *Haitian Refugee Ctr. v. Gracey,* 809 F.2d 794, 809 (D.C.Cir.1987)). The designation of IG as an FTO had no effect on the defendants. While the defendants can challenge the allegation that they violated § 2339B by providing material support to an FTO or could contest that IG was, in fact, designated as an FTO, they cannot assert the due process claims of the FTO and challenge the underlying designation. The element at issue in this case is simply whether IG was designated as an FTO, and the defendants thereafter knowingly

provided, or conspired to provide, material support or assistance to it, not whether the Secretary of State correctly designated IG as an FTO.

The defendants argue that 8 U.S.C. § 1189 is unconstitutional because it does not allow criminal defendants to challenge the designation of IG as an FTO pursuant to § 1189(a)(8). Thus, the defendants contend, the statutory structure deprives them of their right to prove that IG was improperly designated as an FTO. Instead, the defendants claim, they are entitled to the evidence that the Secretary used in making the designation and should be able to litigate the validity of the designation in this Court. Stewart argues that she should be entitled to review the entire administrative record of the designation of IG as an FTO. The Government argues, however, that under § 2339B, it must prove at trial only that the defendants provided material support or resources to an organization designated as an FTO and not that the FTO designation was valid.

Stewart relies on *Dickinson v. United States*, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953), and *United States v. Mendoza–Lopez*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987), in which the defendants were allowed to challenge the administrative orders that formed the basis for their prosecution although the relevant statutes did not provide for judicial review. In *Dickinson*, the defendant, a selective service registrant, was convicted for refusing to submit to induction into the armed services after his claim of eligibility for a ministerial exemption under § 6(b) of the Universal Military Training and Service Act, which exempts regular and duly ordained ministers of religion from military training and service but not from registration, was denied. *Id.* at 390–91, 74 S.Ct. 152. The Act did not provide direct judicial review of selective service classification orders. *Id.* at 394, 74 S.Ct. 152. The

Supreme Court noted, however, that a court could determine whether the local draft board acted without jurisdiction because there was no basis in fact for the classification and further found that Dickinson had shown that he was eligible for the exemption pursuant to the statute. *Id.* at 394–95, 74 S.Ct. 152. The Court explained, "[t]he task of the courts in cases such as this is to search the record for some affirmative evidence to support the local board's overt or implicit finding that a registrant has not painted a complete or accurate picture of his activities. We have found none here." *Id.* at 396, 74 S.Ct. 152. The Supreme Court thus reversed the registrant's conviction.

Similarly, in *Mendoza–Lopez*, two Mexican nationals prosecuted under 8 U.S.C. § 1326 for illegal re-entry following deportation were allowed to argue the invalidity of the underlying deportation order as a defense to the criminal proceeding. The respondents argued that they were denied fundamentally fair deportation hearings because the Immigration Law Judge inadequately informed them of their right to counsel and accepted their unknowing waivers of their right to apply for suspension of deportation. *Mendoza–Lopez*, 481 U.S. at 831, 107 S.Ct. 2148. The Court concluded that there was no congressional intent to allow defendants to challenge deportation orders in § 1326 proceedings. *Id.* at 834–37, 107 S.Ct. 2148. However, the Court found:

Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding. This principle means at the very least that where the defects in an administrative proceeding foreclose judicial review of that proceeding, an alternative means of obtaining review must be made available before the administrative order

may be used to establish conclusively an element of a criminal offense.... Depriving an alien of the right to have the disposition in a deportation hearing reviewed in a judicial forum requires, at a minimum, that review be made available in any subsequent proceeding in which the result of the deportation proceeding is used to establish an element of a criminal offense.

*Id.* at 837–838, 107 S.Ct. 2148 (internal citations and footnotes omitted) (emphasis in original).

*Dickinson* and *Mendoza–Lopez* differ from the case before this Court, however, because under the facts of those cases the defendants were the sole parties who could challenge the validity of the administrative determination underlying their prosecutions. Moreover, it was the defendants in the criminal cases who had been subject to the prior judicial proceedings, the draft board proceeding in *Dickinson* and the deportation proceeding in *Mendoza–Lopez.* Raising the defense in the criminal cases provided those defendants the only meaningful review of the administrative proceeding affecting them. In this case, it is clear that Congress provided IG with judicial review of its own designation. The administrative determination of the designation of an FTO is potentially subject to extensive judicial review but that review is not to occur as a defense in a criminal proceeding. *See* 8 U.S.C. § 1189(a)(8).

The defendants also rely on *Touby v. United States,* 500 U.S. 160, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991). In *Touby,* the Supreme Court held that it was not an unconstitutional delegation of powers for the Controlled Substances Act to authorize the Attorney General to schedule controlled substances on an expedited and temporary basis, even though the temporary scheduling order was not subject to judicial review. The Attorney General in turn delegated his temporary scheduling authority to the Drug Enforcement Administration. In the context of a criminal prosecution for manufacturing and conspiring to manufacture a drug temporarily designated as a controlled substance, the Supreme Court rejected the argument that the statutory provision that a temporary scheduling order is not subject to judicial review violated the nondelegation doctrine. *Touby,* 500 U.S. at 168, 111 S.Ct. 1752. The Court did so because "another section of the Act plainly authorizes judicial review of a permanent scheduling order.... Thus, the effect of [the preclusion of judicial review of temporary scheduling orders] is merely to postpone legal challenges to a scheduling order for up to 18 months, until the administrative process has run its course." *Id.* The Court also noted that the Government did not dispute that an individual facing criminal charges could bring a challenge to a temporary scheduling order as a defense to prosecution and "[t]his is sufficient to permit a court to ascertain whether the will of Congress has been obeyed." *Id.* at 168–69, 111 S.Ct. 1752 (internal quotation marks omitted).

*Touby* does not support the defendants' arguments. First, the issue in *Touby* was whether there was sufficient judicial review to comply with the nondelegation doctrine such that Congressional standards were followed. The defendants here have not relied on any argument based on an impermissible delegation of powers. Second, the Supreme Court noted the existence of judicial review for permanent scheduling orders as sufficient after the temporary scheduling orders had run their course. *See id.* at 168, 111 S.Ct. 1752. The judicial review procedure cited by the Court provides for review in the United States Court of Appeals for the District of Columbia or the Court of Appeals for the circuit in which an aggrieved person's principal place of business is located. *See* 21 U.S.C. § 877. There is no suggestion

that the judicial review for a permanent scheduling order was permitted as a defense in a criminal prosecution, and the challenge to a temporary scheduling order in a criminal prosecution was the only place where a challenge could occur. In this case, like the challenge to a permanent scheduling order, Congress has provided an explicit place for judicial review—in the Court of Appeals for the District of Columbia.

The statutory language of 8 U.S.C. § 1189(b) makes clear that Congress intended for judicial review of FTO designations to occur solely within the Court of Appeals for the District of Columbia within 30 days of publication of the designation in the Federal Register. *See Humanitarian Law Project*, 205 F.3d at 1137 (challenge to designation must be raised in an appeal from a decision to designate a particular organization). Centralized review under the statute is important because FTO designations have significant foreign relations implications that Congress could reasonably conclude should be resolved by a court that is able to develop a unified body of relevant law.

The inability to raise as a defense in this case the correctness of the Secretary's determination that IG is an FTO is not itself a violation of the defendants' rights to due process. The element of the offense is the designation of IG as an FTO, not the

correctness of the determination, and the Government would be required to prove at trial that IG was in fact designated as an FTO. In *Bozarov*, the Ninth Circuit Court of Appeals denied a defendant's claim that a statute rendering a criminal defendant unable to challenge the Secretary of Commerce's export controls implemented through a Commodity Control List ("CCL") violated his due process rights. In that case, the defendant was indicted under the Export Administration Act, 50 U.S.C. § 2401 *et seq.*, for conspiring to export computer equipment without a license that the Secretary had placed on the CCL. Under the statute, "all functions exercised under the Act are explicitly excluded from judicial review...." *Bozarov*, 974 F.2d at 1039. The Ninth Circuit Court of Appeals found that the lack of judicial review did not violate the defendant's due process rights. *Id.* at 1045–46. In so doing, the Court of Appeals relied on *United States v. Spawr Optical Research Inc.*, 864 F.2d 1467, 1473 (9th Cir.1988), and *United States v. Mandel*, 914 F.2d 1215, 1221 (9th Cir.1990), in which the court found no due process violations from the lack of judicial review because the Secretary's decision whether or not to list a product was not an element of the criminal offense charged. *Bozarov*, 974 F.2d at 1045–46.[6] The court noted that the decision to control a commodity "does not in-

---

6. In another section of the *Bozarov* opinion, the Court of Appeals also rejected a contention that the EAA was an unconstitutional violation of the nondelegation doctrine because it allegedly involved the delegation of legislative power to the Executive that was statutorily exempt from judicial review. The Court of Appeals rejected that argument in part on the principle, first, that colorable constitutional claims may be reviewed by the courts even when a statute otherwise precludes judicial review, and, second, that claims that the Secretary acted in excess of his delegated authority under the EAA are also reviewable. *Bozarov*, 974 F.2d at 1044–

45. These principles do not help the defendants. This Court has in fact considered all of the alleged constitutional claims raised by the defendants against the statute and has decided them. With respect to the second issue, the statutory structure cannot reasonably be viewed as a violation of the nondelegation principle, *see Humanitarian Law Project*, 205 F.3d at 1137, and, in any event, judicial review sufficient to assure that Congressional standards are adhered to and that the Secretary acts in accordance with statutory authority is specifically provided in the statute in the Court of Appeals for the District

volve the defendant's individual rights and is not an element of the criminal offense in the pending case." *Id.* at 1046 (internal quotation omitted).[7] In this case, the Government need prove only that the defendants conspired to provide or provided material support or resources to an organization designated as an FTO. The correctness of the designation itself is not an element of the offense and therefore the defendants' right to due process is not violated by their inability to challenge the factual correctness of that determination.

▉▉▉ Stewart makes an additional argument that IG's designation violates her First Amendment associational rights. However, it is clear that what the statute "prohibits is the act of giving material support, and there is no constitutional right to facilitate terrorism by giving terrorists the weapons and explosives with which to carry out their grisly missions. Nor, of course, is there a right to provide resources with which terrorists can buy weapons and explosives." *Humanitarian Law Project,* 205 F.3d at 1133; *accord PMOI,* 327 F.3d at 1244–45. The statute does not interfere with Stewart's First Amendment rights because the material support restriction "is not aimed at interfering with the expressive component of [Stewart's] conduct but at stopping aid to terrorist groups." *Humanitarian Law Project,* 205 F.3d at 1135; *accord PMOI,* 327 F.3d at 1244.

### III.

Stewart seeks to dismiss the Indictment based on the alleged invalidity of the SAMs imposed on Sheik Abdel Rahman as they apply to the charges against her.

Stewart also argues that the Government's attempt to force her to comply with the SAMs violates her First Amendment free speech rights and her right to practice her profession. In addition, she claims that the Government has no authority to enforce the attorney affirmation that she signed in which she agreed to abide by the SAMs.

The SAMs in question were authorized pursuant to 28 C.F.R. § 501.3 which, at all relevant times, provided:

> Upon direction of the Attorney General, the Director, Bureau of Prisons, may authorize the Warden to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury. These procedures may be implemented upon written notification to the Director, Bureau of Prisons, by the Attorney General ... that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons. These special administrative measures ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism. . . .

28 C.F.R. 501.3(a) (June 20, 1997).[8]

Beginning in 1997, the Bureau of Prisons imposed SAMs upon Sheikh Abdel

---

of Columbia. *See* 8 U.S.C. § 1189(b)(3)(A)-(E).

**7.** The Court of Appeals specifically distinguished *Mendoza–Lopez* precisely because the administrative determination discussed in *Bozarov,* unlike the determination in *Mendoza–*

*Lopez,* did not involve the defendant's individual rights. *See Bozarov,* 974 F.2d at 1046.

**8.** Between May 17, 1996 and June 20, 1997 the interim version of 28 C.F.R. § 501.3(a) was identical to the quoted passage except that the word "procedures" was substituted

Rahman that, among other things, limited his access to the mail, media, telephone and visitors "for the purpose of protecting persons against the risk of death or serious bodily injury that might otherwise result." (Ind. ¶ 6 (internal quotation marks omitted).) As of April 7, 1997, the SAMs provided that Sheikh Abdel Rahman "will not be permitted to talk with, meet with, correspond with, or otherwise communicate with any member, or representative, of the news media, in person, by telephone, by furnishing a recorded message, through the mails, through his attorney(s), or otherwise." (Ind.¶ 6.) The Second Circuit Court of Appeals has said that the use of similar SAMs does not violate a prisoner's right to due process. *See United States v. El–Hage,* 213 F.3d 74, 76, 78, 81 (2d Cir. 2000) (per curiam).

On May 16, 2000 Stewart signed an affirmation pursuant to 28 U.S.C. § 1746 in which she acknowledged having read the "Notification of Special Administrative Measures" for Omar Abdel Rahman "dated December 10, 2000 and consisting of eight (8) pages." [9] (Affirmation of Lynne Stewart dated May 16, 2000 ("Stewart Aff." or "May Affirmation") attached as Ex. A to Stewart Memorandum in Support of Motion to Dismiss.) She agreed to "abide by its terms" and (a) not patch any

calls by Sheikh Abdel Rahman through to third parties or otherwise transfer such calls; (b) not leave a translator alone with Sheikh Abdel Rahman and only be accompanied by translators for the purpose of communicating with her client concerning legal matters; and (c) not forward mail from her client to third parties or use meetings, correspondence, or phone calls with Sheikh Abdel Rahman to pass messages between third parties (including, but not limited to, the media) and her client. (May Affirmation.) She affirmed that she understood "that the Bureau of Prisons is relying upon my sworn representations as a member of the bar in this affidavit in affording inmate Abdel Rahman the opportunity to meet and/or speak and/or correspond with me and my office and that any violation of these understandings could, among other things, result in further limitation (or even elimination) of inmate Abdel Rahman's ability to contact me or my office." (May Affirmation.)

The Indictment charges that Stewart violated the SAMs by facilitating and concealing communications from Sheikh Abdel Rahman in jail to IG leaders throughout the world, including on or about May 19 and 20, 2000 when she visited Sheikh Abdel Rahman in prison accompanied by

---

for the word "measures" in the first sentence. 62 Fed.Reg. 33730, 33732 (June 20, 1997); 61 Fed.Reg. 25120, 25120 (May 17, 1996). Section 501.3 was amended on October 31, 2001, to, among other things, extend from 120 days to up to one year, the period of time for which SAMs may be imposed; modify the standard for approving extensions; and authorize the Bureau of Prisons, under certain circumstances, to monitor the mail or communications between an inmate and his attorneys. 66 Fed.Reg. 55062, 55063–64 (Oct. 31, 2001). There is no allegation that the amended § 501.3 applies to the allegations in the Indictment.

9. Stewart argues later in her motion to dismiss that the Indictment alleges an impossi-

bility by charging her with promising to obey a SAM that did not even exist at the time that she signed the affidavit on May 16, 2000. The Government argues that the date is a plain clerical error (apparently for December 10, 1999) and the eight page SAM referred to in the affirmation is unmistakable. At trial, the Government will be required to prove that the statement was a knowingly false statement and Stewart can argue that the statement was not knowingly false because the statement was so incredible. This is not a case where the defendant argues that the statement cannot be the subject of a prosecution because it was literally true. It plainly was not so literally true that it could be dismissed.

Yousry. (Ind.¶¶ 16, 21(h)-(i).) Stewart allegedly allowed Yousry to converse with Sheikh Abdel Rahman about strategic matters, including whether IG should continue to comply with the cease-fire in Egypt. (Ind.¶¶ 21(h)-(i).) The Indictment charges that Stewart helped conceal the conversations, which she knew to be in violation of the SAMs, in part by making extraneous comments in English to mask the conversation in Arabic between Yousry and Sheikh Abdel Rahman. (Ind.¶¶ 21(h)-(i).) In further violation of the SAMs, Stewart then released her client's statement to the press on or about June 14, 2000 "withdrawing his support for the cease-fire that currently exists." (Ind. ¶ 21(k).)

██ Stewart claims that she is entitled to the dismissal of the charges against her based on the illegality or unconstitutionality of the SAMS or the attorney affirmation requirement. Counts One and Two have already been dismissed. However, the SAMs or the attorney affirmation are irrelevant to those counts and could not form a basis for their dismissal. The violation of the SAMs are not an element of those counts and, in any event, as explained below, Stewart's challenge to the SAMs is no defense to any of the counts. Count Four charges that from in or about 1999 Stewart, Sattar, Yousry and others conspired to defraud the United States and an agency thereof, to wit, to hamper, hinder, impede, and obstruct by trickery, deceit and dishonest means, the lawful and legitimate function of the United States Department of Justice and its agency, the Bureau of Prisons, in the administration of SAMs for inmate Sheikh Abdel Rahman. (Ind.¶¶ 26–28.) Count Five charges Stewart with making false statements and making and using a false writing and document when she submitted the May Affirmation. (Ind.¶¶ 29–30.) Stewart's argument for dismissal is without merit.

The Government argues correctly that Stewart cannot defeat the charges against her by attacking the legality or constitutionality of the statute or requirement that prompted her alleged deceit. The Government relies on *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), in which the petitioners had been convicted of conspiring to obtain fraudulently the services of the National Labor Relations Board by filing false so-called non-Communist affidavits in purported satisfaction of § 9(h) of the Taft–Hartley Act. *Id.* at 857–58, 86 S.Ct. 1840. The petitioners argued that their convictions should be set aside on the ground that §. 9(h) was unconstitutional. *Id.* at 864, 86 S.Ct. 1840. The Supreme Court declined to decide the constitutionality of § 9(h), stating:

We need not reach this question, for petitioners are in no position to attack the constitutionality of § 9(h). They were indicted for an alleged conspiracy, cynical and fraudulent, to circumvent the statute. Whatever might be the result where the constitutionality of the statute is challenged by those who of necessity violate its provisions and seek relief in the courts is not relevant here. This is not such a case. The indictment here alleges an effort to circumvent the law and not to challenge it—a purported compliance with the statute designed to avoid the courts, not to invoke their jurisdiction.

*Id.* at 865, 86 S.Ct. 1840.

The Supreme Court's conclusion is clear:

It is no defense to a charge based upon this sort of enterprise that the statutory scheme sought to be evaded is somehow defective. Ample opportunities exist in this country to seek and obtain judicial protection. There is no reason for this Court to consider the constitutionality of a statute at the be-

hest of petitioners who have been indicted for conspiracy by means of falsehood and deceit to circumvent the law which they now seek to challenge. This is the teaching of the cases.

*Id.* at 866, 86 S.Ct. 1840 (internal footnote omitted).

As in *Dennis*, Stewart now attacks the SAMs that she allegedly sought to evade and concerning which she allegedly submitted a false affirmation. But such a claim "will not be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit. One who elects such a course as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is unconstitutional." *Id.* at 867, 86 S.Ct. 1840. The Supreme Court has repeatedly refused to hear attacks on statutes from those accused of deliberately violating the statutes by fraud and deceit. *See, e.g., Bryson v. United States*, 396 U.S. 64, 68, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969) ("Guided by Dennis v. United States, we hold that the question of whether § 9(h) was constitutional or not is legally irrelevant to the validity of the petitioner's conviction under § 1001, the general criminal provision punishing the making of fraudulent statements to the Government.") (internal citation omitted); *see also United States v. Knox*, 396 U.S. 77, 79, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969) ("one who furnishes false information to the Government in feigned compliance with a statutory requirement cannot defend against prosecution for his fraud by [challenging] the validity of the requirement itself"). As the Supreme Court instructed:

> it cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked. Our legal system provides methods for challenging the Government's right to ask questions—lying is not one

of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood.

*Bryson*, 396 U.S. at 72, 90 S.Ct. 355.

Prior to *Dennis*, the Second Circuit Court of Appeals recognized a narrow exception to these fundamental principles where there is no colorable authority for the Government's action. In *United States v. Barra*, 149 F.2d 489, 490 (2d Cir.1945), the appellant had been convicted of violating 18 U.S.C. § 80 for failing to disclose his membership in the Nazi party in an application for a certificate of identification as an alien enemy. The appellant argued that because the statute authorizing the President to restrain alien enemies provided no penalty for failure or refusal of an alien to register, neither the President nor the Attorney General could make it a crime to make a false statement in connection with such registration. *Id.* The Second Circuit Court of Appeals found, however, that "once it appears that the department 'has colorable authority to do what it is doing,' an accused under this statute cannot justify his falsehood by a collateral attack upon the authority" and rejected the petitioner's challenge. *Id.* The Court of Appeals determined that the President had statutory authority to restrain alien enemies in the United States and that the statute also "confers upon him the further authority 'to establish any other regulations which are found necessary in the premises and for the public safety.'" *Id. See also United States v. Holroyd*, 732 F.2d 1122, 1126–27 (2d Cir. 1984) (upholding Government prosecution for perjury although no statute or regulation explicitly authorized the use of the IRS forms that were fraudulently filed in the case).

The Department of Justice had the colorable authority to implement the SAMs

relating to Sheikh Abdel Rahman and it also had the colorable authority to seek affirmations from those visiting Sheikh Abdel Rahman as a means to assure that the SAMs were complied with and were not circumvented. 28 C.F.R. § 501.3 clearly authorized the Attorney General and the Bureau of Prisons to implement SAMs. Indeed, the validity of restrictive SAMs has been upheld as lawful not simply within the colorable authority of the Department of Justice. *See, e.g., Yousef v. Reno,* 254 F.3d 1214, 1220 (10th Cir.2001); *El-Hage,* 213 F.3d at 81; *see also United States v. Felipe,* 148 F.3d 101, 110 (2d Cir.1998). Requiring affirmations from visitors, including attorneys, was reasonably within the jurisdiction of the Department of Justice as a measure for effectuating the SAMs relating to Sheikh Abdel Rahman. *See United States v. Davis,* 8 F.3d 923, 929 (2d Cir.1993) (false statements made by inmate defendant to officials at state correctional facility were within the jurisdiction of the Bureau of Prisons and Marshal Service sufficient for a conviction under 18 U.S.C. § 1001); *United States v. Salman,* 189 F.Supp.2d 360, 364–66 (E.D.Va.2002) (false statements by visitor to local official responsible for housing federal prisoners was within jurisdiction of Marshal Service sufficient for a violation of 18 U.S.C. § 1001). Therefore, Stewart cannot challenge the legitimacy of the SAMs or the Government's action requiring the May Affirmation in which she agreed to abide by them as a defense to conspiring to defraud the Government or to make a false statement in violation of 18 U.S.C. § 1001.[10] The regulation made it plain that SAMs on an inmate can affect third parties because they could regulate visits and telephone calls. The SAMs would be ineffective if those restrictions could be circumvented.

Furthermore, it is clear that Stewart had avenues of redress within the legal system through which she could challenge the SAMs or the Government's authority to obtain the May Affirmation. *See, e.g., United States v. Reid,* 214 F.Supp.2d 84, 91 (D.Mass.2002) (based in part on application by defense counsel, court refused to require defense counsel to sign affirmation acknowledging receipt of SAM restrictions but placed court-ordered restrictions on the dissemination of information by defense counsel); *United States v. Hale,* No. 03 Cr. 11, 2003 WL 1989620 (N.D.Ill. Apr. 28, 2003) (on application of defense counsel, refusing to require attorney to pledge to obey a SAM relating to the attorney's client, but noting "the fact that the Government may not require an attorney to pledge that he or she will abide by the Special Administrative Measures placed on an inmate does not mean that, should an attorney choose to engage in acts which result in the inmate evading those Measures, the attorney may not be found to be in violation of some criminal laws") (*Hale* Tr. at 11–12 attached as Ex. 1 to Stewart Reply).

Stewart made the decision not to challenge the validity of the SAMs imposed on Sheikh Abdel Rahman nor to refuse to sign the May Affirmation and to challenge the Government's authority to request the affirmation as other attorneys have done. Instead, she is alleged to have signed the document knowing it to be false and now seeks to attack collaterally the Government's authority to have required the May Affirmation. This strategy is foreclosed by the teaching of *Dennis* and the cases

---

**10.** The Government concedes that one of the elements for a violation of 18 U.S.C. § 1001 that it must prove at trial is that the allegedly false statement was made in a "matter within the jurisdiction of the executive . . . branch of the Government of the United States. . . ." 18 U.S.C. § 1001(a).

that have followed it. For these reasons, Stewart's motion to dismiss the Indictment on the ground that she cannot be held liable for conspiring to defraud the United States in connection with the SAMs relating to her client or for submitting an allegedly false affirmation in connection with her compliance with those SAMs is denied.

### IV.

Sattar moves to dismiss Count Three of the Indictment on the ground that the Indictment fails to allege the essential element of a crime of violence in violation of 18 U.S.C. § 373 with sufficient factual detail. The Government argues that Count Three satisfies the pleading requirements of Federal Rule of Criminal Procedure 7(c)(1) and that the details alleged in the overt acts charged in Count One provide sufficient details of the crime charged in Count Three.[11] Should the Grand Jury return a superseding indictment incorporating the allegations in Paragraph 21 of the Indictment into Paragraph 24, as the Government represents it will seek, the motion is denied for the reasons explained below.

Federal Rule of Criminal Procedure 7(c)(1) provides that an Indictment "shall be a plain, concise and definite statement of the essential facts constituting the offense charged."[12] "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of facts." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir.1992) (citing *Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)). Moreover, " 'an indictment need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.' " *Id.* (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)). The Court of Appeals for the Second Circuit has also noted that " '[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made.' " *Id.* (quoting *United States v. Silverman*, 430 F.2d 106, 111 (2d Cir.1970)).

 Count Three tracks the language of 18 U.S.C. § 373 which makes it unlawful to:

> with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicit[ ], command[ ], induce[ ], or otherwise endeavor[ ] to persuade such other person to engage in such conduct. . . .

18 U.S.C. § 373(a). Count Three satisfies the well-established pleading requirements

---

**11.** Paragraph 24 of the Indictment currently incorporates into Count Three the allegations made in Paragraphs 1–14. The Government represents that it will ask the Grand Jury to return a superseding indictment that incorporates Paragraph 21, which includes all the overt acts alleged in Count One, into Paragraph 24. The parties agreed at oral argument that the Court should decide the motion on the assumption that the Government will seek such a superseding indictment and that such a superseding indictment will be returned by the Grand Jury so that the Court can efficiently resolve the issues in the motions to dismiss the Indictment currently before the Court. Consistent with the parties' agreement, although the Court has dismissed Counts One and Two, to avoid repetitive motions, the Court will decide the current motions on the assumption that the overt acts in Paragraph 21 will be incorporated or included in Count Three.

**12.** The December, 2002 Amendments to the Criminal Rules did not change this language.

in this Circuit. It lists the specific crimes of violence allegedly solicited, namely violations of 18 U.S.C. § 956 (conspiring to kill a person in a foreign country), 18 U.S.C. § 2332 (killing a national of the United States while the national is outside the United States), and 18 U.S.C. § 2332b (committing acts of terrorism transcending national boundaries). It is pleaded in the language of the statute and provides sufficient particulars to give notice to the defendants of the charges against them and to permit the defendants to plead double jeopardy if necessary.

Sattar argues that the Indictment fails to allege conduct sufficient to establish a basis for the charge in Count Three. In particular he argues that the Indictment fails to specify the circumstances strongly corroborative of the required intent. However, the overt acts in Count One that the Government intends to incorporate are sufficient. The Indictment charges that Sattar, among other things, participated in drafting and disseminating a fatwah to be issued under Sheik Abdel Rahman's name that was entitled "Fatwah Mandating the Bloodshed of Israelis Everywhere" and that called on "brother scholars everywhere in the Muslim world to do their part and issue a unanimous fatwah that urges the Muslim nation to fight the Jews and to kill them wherever they are." (Ind. ¶¶ 21(p)-(q).) With the incorporation of Paragraph 21, Count Three will also allege that Sattar aided in issuing a statement from Sheikh Abdel Rahman renouncing the cease-fire between IG and the Egyptian government. (Ind. ¶¶ 21(d)-(f), (k)-(n).) These specific acts are sufficient to support the allegation that Sattar solicited crimes of violence in violation of 18 U.S.C. § 373. Moreover, such acts and statements that "instruct, solicit, or persuade others to commit crimes of violence" are not protected by the First Amendment and may be prosecuted. *Rahman,* 189 F.3d at 117.

The defendant's argument that the allegations are insufficient in that they fail to show that Sattar was serious about the crimes of violence being carried out is also without merit. The allegations that Sattar participated in drafting and distributing the fatwah and disseminating Sheik Abdel Rahman's renunciation of IG's cease-fire are far more specific as to his intent than the example posed by the defendant of someone who shouts "kill the umpire."

Sattar argues, in the alternative, that he is entitled to a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f) regarding the allegations in Count Three. Sattar's requests include (1) the names and identities of the individuals who were the objects of Sattar's alleged felonious conduct or the victims of such conduct; (2) the names and identities of persons against whose property Sattar allegedly used, attempted to use, and threatened to use force in violation of the statute and the location of the property Sattar allegedly used in so doing; (3) the dates and locations on or in which the defendant allegedly used, threatened to use, or attempted to use physical force against property or against persons; and (4) the names and identities of individuals who Sattar allegedly induced or otherwise attempted to persuade to engage in violent terrorist operations to achieve IG's objectives and the dates on which the defendant allegedly did so.

The decision whether to grant a bill of particulars pursuant to Rule 7(f) rests with the sound discretion of the district court. *See United States v. Cephas,* 937 F.2d 816, 823 (2d Cir.1991); *United States v. Panza,* 750 F.2d 1141 (2d Cir. 1984); *United States v. Strawberry,* 892 F.Supp. 519, 526 (S.D.N.Y.1995). The purpose of a bill of particulars is to enable a defendant "to prepare for trial, to prevent surprise, and to interpose a plea of double

jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). A bill of particulars is required "only when the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.1990) (citation omitted); *see also Cephas*, 937 F.2d at 823; *Panza*, 750 F.2d at 1148. The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories. *See United States v. Mitlof*, 165 F.Supp.2d 558, 569 (S.D.N.Y.2001) (collecting cases); *see also United States v. Szur*, 97 Cr. 108, 1998 WL 132942, at *11 (S.D.N.Y. March 20, 1998), *aff'd*, 289 F.3d 200 (2d Cir.2002). "Generally, if the information sought by the defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574; *see United States v. Barnes*, 158 F.3d 662, 665 (2d Cir.1998).

■ In a case such as this, where the Indictment charges a violation of 18 U.S.C. § 373 with sufficient particularity and discovery has been extensive, there is no cause for a bill of particulars. Such requests are merely "an impermissible attempt to compel the Government to provide the evidentiary details of its case." *United States v. Biaggi*, 675 F.Supp. 790, 810 (S.D.N.Y.1987). Moreover, this is not a case such as *United States v. Bin Laden*, 92 F.Supp.2d 225 (S.D.N.Y.2000), in which the Government alleged 267 discrete criminal offenses, including 229 counts of murder and six conspiracies and in which the

indictment included 144 overt acts charged "in such general terms as to require seemingly unlimited research and investigation by the Defendants in an attempt to answer those charges." *Id.* at 237. Instead "the type of conduct [charged in the Indictment] is sufficiently concrete and particular as to permit a reasonably focused investigation." *Id.* at 239 n. 24 (rejecting bill of particulars requested for certain charged overt acts including issuing fatwahs). The motion for a bill of particulars as to Count Three is denied.

## V.

■ Stewart argues that Count Five of the Indictment which charges Stewart with making false statements in violation of 18 U.S.C. § 1001 should be dismissed because the May Affirmation that provides the basis for the charge is merely a promise of future conduct and not a factual statement. Therefore, Stewart argues, the May Affirmation cannot support a false-statement charge and allowing prosecution under the statute would in effect criminalize every broken contract with the Government.[13]

Title 18, United States Code, Section 1001 provides, in relevant part:

whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully-

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2) makes any materially false, ficticious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, ficticious, or fraud-

---

**13.** Stewart's motion touches on this issue only briefly. However, the National Association of Criminal Defense Lawyers ("NACDL") has submitted two amicus briefs advocating this position which Stewart adopts.

ulent statement or entry; shall be fined under this title or imprisoned . . . .

18 U.S.C. § 1001(a)(1)-(3).

By the terms of the May Affirmation described above, Stewart agreed to abide by the SAMs governing Sheikh Abdel Rahman's confinement. In so doing, Stewart specifically agreed that neither she nor any member of her staff would use her visits with Sheikh Abdel Rahman to pass messages between her client and third parties, including the media. (May Affirmation ¶ 4.) Stewart signed the May Affirmation on May 16, 2000. (May Affirmation.) The Indictment alleges that only a few days later, on May 19 or 20, 2000, Stewart visited Sheikh Abdel Rahman in prison and violated the SAMs when she allowed Sheikh Abdel Rahman to dictate letters to Yousry about Sheikh Abdel Rahman's decision to withdraw his support for the cease-fire. (Ind.¶¶ 21(h)-(i), 30.) The Government alleges that Stewart then submitted the May Affirmation to the Government on or about May 26, 2000 and thereafter communicated Sheikh Abdel Rahman's message to the media that he was renouncing his support for the cease-fire. The Government contends both that Stewart violated § 1001 at the time of the May Affirmation's making because she did not intend to abide by the terms of the agreement, and that she had clearly violated the agreement by the time she submitted the May Affirmation to the Government on May 26, 2000 following her visit to Sheikh Abdel Rahman.

█ The Government argues that the Court should follow *United States v. Shah*, 44 F.3d 285 (5th Cir.1995), and find that a promise that a promisor has no intention

of keeping when made can form the basis of a § 1001 violation. In *Shah*, the defendant was convicted of violating § 1001 in connection with a statement made in a General Services Administration ("GSA") bid solicitation. The statement read, in part, "The prices in this offer have not been and will not be knowingly disclosed by the offeror . . . to any other offeror or competitor before . . . contract award." *Id.* at 289 (ellipses in original). The Government argued that the defendant had contacted another competitor after receiving the solicitation from the GSA but before submitting the form and suggested that they exchange bids. *Id.* at 287. The next day the defendant allegedly signed and mailed the solicitation to the GSA in which he certified that the prices listed in the bid "have not been and will not be disclosed." *Id.* at 287–88. The competitor thereafter contacted the GSA and agreed to record a conversation under the supervision of an investigator in which the defendant agreed to swap bids with the informant. *Id.* at 288. The parties subsequently exchanged such information. *Id.*

In affirming the defendant's conviction, the Court of Appeals for the Fifth Circuit rejected the defendant's argument, also made here, that "a promise of future performance cannot, as a matter of law, constitute a violation of 18 U.S.C. § 1001." *Id.* at 288. The Court of Appeals found instead that "a promise to perform is not only a prediction, but is generally also a representation of present intent. Promises and representations are simply not mutually exclusive. The plain terms of the statute can therefore be said to cover representations of present intent." *Id.* at 293.[14]

---

**14.** NACDL also argues that because the text of § 1001 does not use the word "promise" while other statutes criminalizing false promises also criminalize false or fraudulent representations, in order to conclude that false or fraudulent representations include false

promises the Court would have to also conclude that Congress used unnecessary and redundant words in such statutes. Moreover, NACDL argues, the absence of the word "promise" from § 1001 as compared to its presence in the mail, wire, and bank fraud

Contrary to the defendant's argument that holding Stewart liable under § 1001 would criminalize the breaking of any promise made to the Government, *Shah* made clear that "a broken promise is not alone a basis for criminal liability under section 1001." *Id.* at 289. Instead, the Government must prove, among other things, that the allegedly false statement was false when made because "*[i]t is not the breaking of the promise that exposes a defendant to criminal liability, but making a promise with the intent to break it.*" *Id.* at 289–90, 291 (emphasis in original).

NACDL argues that *Shah* is wrong and that the Court should instead look to *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), which found that a check even though written without sufficient funds is merely a promise to pay a sum certain and not a statement that could form the basis of a false-statement prosecution under 18 U.S.C. § 1014 relating to false statements in loan and credit applications.[15] *Id.* at 280–87, 102 S.Ct. 3088. Under *Williams*, NACDL argues, the May Affirmation is not a "factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Id.* at 284, 102 S.Ct. 3088. However, the holding and reasoned analysis in *Shah* is on point and persuasive. *Shah* considered *Williams* and rejected the argument that *Williams* should change the result in that case. *Shah*, 44 F.3d. at 291. *Williams* contained no discussion of whether a knowingly false statement of present intent could be a false statement

particularly for purposes of 18 U.S.C. § 1001. Its discussion was centered on the legal effect of a check.

More on point is the decision by the Court of Appeals for the Second Circuit in *United States v. Uram*, 148 F.2d 187 (2d Cir.1945). In that case, the Court of Appeals found that the appellant was properly convicted of a charge of causing a loan to be made based on the false representation of what the loan proceeds were to be used for. The Court of Appeals explicitly rejected the argument made by Stewart in this case:

> Count one is not invalid for statement merely of a possible future occurrence. It is an allegation of a present statement and the assertion of existing intent, and promise, to use money for the specific purpose [specified], and for no other purpose whereas in fact the intent was to divert [some of the money] to other uses entirely and to spend but a fraction of the remaining sum on the project stated, upon which representation the loan was procured.

*Id.* at 189–90 (internal quotation marks omitted). *See also United States v. Mandanici*, 729 F.2d 914 (2d Cir.1984) (upholding sufficiency of the evidence to sustain a conviction for a violation of 18 U.S.C. § 1001 based on a false representation of present intentions to spend $88,000 on rehabilitation work with a federal agency).

For the reasons explained at length in *Shah*, which are consistent with *Uram* and *Mandanici*, a knowingly false promise,

statutes indicates Congress' intent not to penalize false promises in § 1001. The Court of Appeals for the Fifth Circuit rejected similar arguments in *Shah*, 44 F.3d at 293–94.

**15.** NACDL also argues that under *United States v. Diogo*, 320 F.2d 898 (2d Cir.1963), a statement or representation that is literally true, in that case that the defendants were married to citizens, cannot be the basis for

criminal prosecution under § 1001. However, *Diogo* does not help Stewart. At trial, the Government will be required to prove that the statement was in fact knowingly false when made. Even Stewart's argument that the affirmation executed in May 2000 incorrectly referred to non-existent December 10, 2000 SAMs is not an argument that the affirmation was literally true. *See supra* note 10.

which is a knowingly false statement of present intent, can be a false statement within the meaning of 18 U.S.C. § 1001.

Finally, the Government contends that even if the Court were to reject the argument that Stewart can be prosecuted under § 1001 for false representations about her intent to perform future acts, the May Affirmation was in fact false when submitted to the Government. This theory is also sufficient to support the charge in Count Five. Therefore, the May Affirmation is a proper basis for a § 1001 prosecution and the motion to dismiss Count Five is denied.

## VI.

Stewart and Sattar both move for severance. Stewart alleges that she should not face trial with the other defendants and is thus entitled to severance under Federal Rule of Criminal Procedure 8(b), and severance should also be granted pursuant to Federal Rule of Criminal Procedure 14 and *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Sattar argues that he is entitled to severance because Yousry implicated Sattar in post-arrest statements that the Government may offer in its case-in-chief against Yousry at trial.

Federal Rule of Criminal Procedure 8(b) provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts

together or separately. All defendants need not be charged in each count.[16]

In a case such as this, where multiple defendants are charged in the same Indictment, Rule 8(b) governs any motion for severance. *See United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir.1988). "Thus, multiple defendants may be charged and tried for multiple offenses only if the offenses are related pursuant to the test set forth in Rule 8(b), that is, only if the charged acts are part of a 'series of acts or transactions constituting ... offenses.'" *Id.* For joinder under Rule 8(b) to be permissible, the acts in which the defendants are alleged to have participated "must be unified by some substantial identity of facts or participants or arise out of a common plan or scheme." *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989) (internal quotation marks and citations omitted); *see also United States v. Reinhold*, 994 F.Supp. 194, 197 (S.D.N.Y. 1998); *United States v. Lech*, 161 F.R.D. 255, 256 (S.D.N.Y.1995). However, two separate transactions do not constitute a "series" within the meaning of Rule 8(b) "merely because they are of a similar character or involve one or more common participants." *Lech*, 161 F.R.D. at 256 (internal citation omitted); *see also United States v. Rittweger*, 259 F.Supp.2d 275, 283 (S.D.N.Y.2003).

The Courts of Appeals disagree over whether Rule 8(b) severance motions should be decided solely on the basis of the allegations in the Indictment or instead may be decided on the basis of pretrial representations made by the Government. *See United States v. Gallo*, 98 Cr. 338, 1999 WL 9848, at *2 (S.D.N.Y. Jan. 11,

---

**16.** The language of Rule 8 was amended, effective December 1, 2002 as part of the general restyling of the Federal Rules of Criminal Procedure to make them more easily understood and to make style and terminology consistent throughout the rules. The changes were intended to be stylistic only. *See* Adv. Comm. Notes to 2002 Amendments. Therefore, the cases interpreting Rule 8 prior to the amendment can be used to interpret the amended Rule.

1999) (collecting cases). In the context of a motion for severance under Rule 8(a), the Court of Appeals for the Second Circuit has approved a trial court's reliance in part "on the Government's representation." *See United States v. Ajlouny,* 629 F.2d 830, 842 (2d Cir.1980). However, the Court of Appeals for the Second Circuit has not ruled on this issue in the context of joinder under Rule 8(b), and Rule 8(b), unlike Rule 8(a), specifically turns on what is "alleged" against the defendants. In any event, on the face of the Indictment, in this case, the allegations are properly joined because there is both "substantial identity of facts or participants" and the allegations in the Indictment "arise out of a common plan or scheme." *Attanasio,* 870 F.2d at 815; *see also Rittweger,* 259 F.Supp.2d at 284.[17]

■ The Government is correct and joinder is proper in this case. There is a substantial identity of participants in each of the remaining Counts of the Indictment. Sattar is charged in Count Three with soliciting crimes of violence. Stewart, Sattar, and Yousry are charged in Count Four with conspiring to defraud the United States by obstructing the administration of the SAMs, and Stewart alone is charged in Count Five with making false statements when agreeing to comply by the SAMs.

The actions alleged in the Indictment demonstrate a substantial identity of facts and clearly arise out of a common plan or scheme. The substantive solicitation charge in Count Three which is alleged against Sattar includes acts of solicitation of violence including the issuance of the fatwah attributed to Sheikh Abdel Rahman "Mandating the Bloodshed of Israelis Everywhere" and the issuance of the statement from Sheikh Abdel Rahman renouncing the cease-fire between IG and the Egyptian government. The conspiracy alleged in Count Four against Sattar, Stewart, and Yousry charges a conspiracy to defraud the United States, to wit, to hamper, impede, and obstruct the lawful functions of the Department of Justice and the Bureau of Prisons in the administration of the SAMs for Sheikh Abdel Rahman. The overt acts in furtherance of this conspiracy include overt acts relating to alleged efforts by Sattar, Yousry, and Stewart to facilitate the issuance of the same statements attributed to Sheikh Abdel Rahman from prison. Count Five charges Stewart with making a false statement by submitting an affirmation that she agreed to abide by the same SAMs applicable to Sheikh Abdel Rahman. All of these allegations are inextricably interrelated.

■ Nor is there a basis to grant a severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Rule 14 provides, in relevant part, that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may

---

17. The discussion below focuses on Counts Three through Five of the Indictment because the Court has dismissed Counts One and Two. However, most of Count One is realleged in Count Two, and substantial parts of Count One, including the overt acts, are realleged in Counts Three, Four, and Five or the Government has indicated its intention to seek a superseding indictment, particularly realleging the overt acts from Count One in Count Three. *See supra* note 11. The Government has also indicated its intent to seek a superseding indictment to make it clear that the Overt Acts realleged in Count Four are in fact certain overt acts charged in paragraph 21, and not paragraph 20 as currently alleged. *See infra* note 20. Given the interrelationship of the allegations in Counts One and Two and those in Counts Three, Four, and Five, including the substantial identity of facts and participants and the fact that all of the counts arise out of a common scheme or plan, the decision on the severance motions would be no different *if Counts One and Two were still* included.

order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."[18] The Supreme Court teaches that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). There is a preference for joint trials in the federal system for defendants who are indicted together. Joint trials promote efficiency and promote the interests of justice, by, among other means, avoiding inconsistent verdicts. *Id.* at 537, 113 S.Ct. 933. Thus, a defendant seeking such a severance "must show that he [will be] so severely prejudiced by the joinder as to [be] denied a fair trial, not that he might have [ ] a better chance for acquittal at a separate trial." *United States v. Torres,* 901 F.2d 205, 230 (2d Cir.1990) (citations and internal quotation marks omitted).

▌ A danger of "prejudicial spillover," where evidence which would be inadmissible against one defendant if tried individually could be introduced in a joint trial, could provide a basis for a severance. Hence, a severance could be warranted where "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that defendant was guilty." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933 (citing *Kotteakos v. United States,* 328 U.S. 750, 774–775, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). However, claims of prejudicial spillover rarely succeed, particularly in the context of conspiracy cases because the evidence could be admitted in the separate trials. *See Unit-*

ed *States v. Muyet,* 945 F.Supp. 586, 596 (S.D.N.Y.1996); *see also United States v. Haynes,* 16 F.3d 29, 32 (2d Cir.1994); *United States v. Szur,* 1998 WL 132942, at *12–13.

Stewart argues that she would be unfairly prejudiced by a joint trial because she is charged with acts that differ from those of her co-defendants. Specifically, Stewart claims that she should not be linked to the acts of violence associated with charges that she contends have no connection to her role as Sheikh Abdel Rahman's legal counsel. However, "[t]his case simply is not one where 'the risk that the jury will not, or cannot, follow instructions is so great ... that the practical and human limitations of the jury system cannot be ignored.'" *United States v. Cardascia,* 951 F.2d 474, 484 (2d Cir.1991) (quoting *Bruton,* 391 U.S. at 135, 88 S.Ct. 1620). There is no reason to believe that the jury cannot judge those acts and defendants charged in Count Three independently of the allegations that they will consider in connection with Stewart. *See, e.g., United States v. Bin Laden,* 109 F.Supp.2d 211, 219 (S.D.N.Y.2000) ("Federal courts, quite routinely, have found juries able to follow and abide by appropriate cautionary instructions.").

Moreover, Stewart's argument that she stands before the jury differently because jurors would not understand the intricacies of her role as defense counsel when judging her case as compared with the other defendants is wholly without merit. Not only would a jury be perfectly capable of evaluating Stewart's actions regardless of her qualifications as a lawyer, but the Government argues persuasively that Stewart cannot so easily distance herself from charges involving violent conduct con-

18. Rule 14 was amended effective December 1, 2002 as part of the general restyling of the Criminal Rules. It was not intended to effect any substantive change and therefore cases

interpreting the prior Rule remain instructive. *See* Adv. Comm. Notes to 2002 Amendments; *see also supra* note 16.

tained in the Indictment. For example, several of the overt acts to be realleged in Count Three against Sattar also include Stewart and relate to alleged efforts to facilitate the issuance of the fatwah "Mandating the Bloodshed of Israelis Everywhere" and the statement from Sheikh Abdel Rahman renouncing the cease-fire. (*See* Ind. ¶¶ 21(h), (i), (n).) These same overt acts are alleged in furtherance of the conspiracy charged in Count Four. There is no reason to sever the claims against Stewart on this basis. *See Bin Laden,* 109 F.Supp.2d at 216–219.

Stewart and Sattar also argue for severance based on the anticipated admission of co-defendant statements, specifically, certain post-arrest statements given by Yousry that may incriminate them. The Government represents, however, that if it seeks to introduce such statements at trial the statements will be properly redacted to comply with *Bruton* and its progeny. This representation is sufficient and there is no reason to grant a severance on this basis.

## VII.

The defendants make several other arguments.[19]

 Stewart claims that Counts One and Four should be dismissed as duplicitous because both counts allege multiple conspiracies. "An indictment is impermissibly duplicitous where: (1) it combines two or more distinct crimes into one count in contravention of Fed.R.Crim.P. 8(a)'s requirement that there be a separate count for each offense, and (2) the defendant is prejudiced thereby." *United States v. Sturdivant,* 244 F.3d 71, 75 (2d Cir.2001) (internal citation omitted); *see also United States v. Margiotta,* 646 F.2d 729, 733 (2d Cir.1981). Count One charges that all four defendants together with others known and unknown "combined, conspired, confederated and agreed together and with each other to knowingly provide material support and resources" to an FTO. (Ind. ¶ 19.) Count One therefore alleges a single conspiracy among all participants. Count Four charges that Stewart, Sattar, and Yousry

> combined, conspired, confederated and agreed together and with each other to defraud the United States and an agency thereof, to wit, to hamper, impede, and obstruct by trickery, deceit and dishonest means, the lawful and legitimate functions of the United States Department of Justice and its agency, the Bureau of Prisons, in the administration and enforcement of Special Administrative Measures for inmate Sheik Abdel Rahman.

(Ind. ¶ 27.) Count Four similarly alleges a single conspiracy.[20] Moreover, "[w]hether

**19.** The Court has considered all of the arguments raised including those directed at Counts One and Two, even though the Court has dismissed those counts. This is to avoid multiple motions, particularly in view of the January 12, 2004 trial date.

**20.** Stewart makes an additional argument as to the failure of Count Four to allege any overt acts. Paragraph 28(a) of Count Four states: "The allegations contained in Overt Acts (b) through (n), (r) and (s), in Paragraph 20 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein." However, ¶ 20 includes only subparagraphs (a)—(d) and re-

fers to the Means and Methods of the conspiracy and not the Overt Acts. The Government represented at argument, (Hearing Tr. at 92), that this was an obvious typographical error and that it will ask the Grand Jury to return a superseding indictment realleging the overt acts that are in fact alleged in ¶ 21 of Count One rather than ¶ 20. As with the Government's representation to seek a superseding indictment to reallege the overt acts from Count One in Count Three, to avoid multiple motions, this motion is being decided on the basis that the Government will seek such a superseding indictment to correct the obvious typographical error.

the Government has proven the existence of the conspiracy charged in the indictment and each defendant's membership in it, or instead, has proven several independent conspiracies is a question for a properly instructed jury." *United States v. Trippe*, 171 F.Supp.2d 230, 238 (S.D.N.Y. 2001) (quoting *United States v. Johansen*, 56 F.3d 347, 350 (2d Cir.1995)). The motion to dismiss Counts One and Four as duplicitous is therefore denied.

■ Stewart also contends that Count Two should be dismissed as duplicitous because the Government charges multiple acts of providing material support in violation of § 2339B in that count. The Second Circuit Court of Appeals has made clear that "a single count of an indictment should not be found impermissibly duplicitous whenever it contains several allegations that could have been stated as separate offenses but only when the failure to do so risks unfairness to the defendant." *Margiotta*, 646 F.2d at 733. Therefore, the Court of Appeals in *Margiotta* reversed the district court's finding that a mail-fraud indictment that alleged multiple mailings in a single count was duplicitous when the indictment alleged a single scheme to defraud. *Id.* at 733–34. The Government argues persuasively that the acts alleged in Count Two are part of a continuous course of conduct and that combining these acts into one count is not unfair to Stewart because the Indictment provides adequate notice of the conduct at issue. Therefore, the motion to dismiss Count Two as duplicitous is also denied.

Stewart and Sattar seek additional bills of particulars. Stewart seeks particulars including: (1) the date on which Stewart became a member of the conspiracy alleged in Count One, the names of her alleged co-conspirators, and the date and location of each act that she allegedly performed in furtherance of the conspiracy; (2) the date and place of each act of provi-

sion of material support and resources alleged in Count Two, the person or persons who directly committed each such act and the type of material support or resources allegedly provided; (3) the date and location of each act allegedly performed by Stewart in furtherance of the conspiracy alleged in Count Four; and (4) the date of each alleged false, ficticious, and fraudulent statement and representation and of each false writing and document related to Count Five. Sattar seeks particulars, in addition to those already discussed in Part IV, including: (1) the nature and recipient of the material support and resources, and the dates, times and places of such provision, alleged in Count One; (2) the manner and means by which specified messages were allegedly passed from Sheikh Abdel Rahman to others; and (3) the names of the unidentified co-conspirators.

As the Court has already explained, the purpose of a bill of particulars is to enable a defendant "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *Bortnovsky*, 820 F.2d at 574. The Court will require a bill of particulars only when an indictment is so general that it fails to advise a defendant of the specific acts of which he or she is accused. *See Torres*, 901 F.2d at 234.

The Indictment in this case provides Stewart and Sattar with adequate notice of the charges against them so that they can prepare for trial and could interpose a plea of double jeopardy should they face prosecution for a second time for the crimes charged in the Indictment. *See United States v. Viertel*, No. S2 01 Cr. 571, 2002 WL 1560805, at *12 (S.D.N.Y. July 15, 2002). The particulars sought in these requests are merely an attempt to preview the Government's evidence or legal theories, a ground on which the Court will not

grant a bill of particulars. *See Mitlof,* 165 F.Supp.2d at 569.

▇ Moreover, "demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied." *United States v. Trippe,* 171 F.Supp.2d 230, 240 (S.D.N.Y. 2001) (collecting cases). To the extent that the requests for the identities of unnamed co-conspirators is really a request for a list of the witnesses that the Government intends to call at trial, the defendants are not entitled to such a list because they have not made the necessary specific showing of need. *See United States v. Jones,* No. 00 Cr. 182, 2000 WL 1448640, at *3 (S.D.N.Y. Sept. 28, 2000) (collecting cases).

In this case, the detailed Indictment and extensive other materials provided to the defendants adequately apprise the defendants of the charges against them. The Court has worked with the parties to set a trial date in January 2004, which gives the parties ample time to produce and review discovery in a timely manner. The motions for bills of particulars are therefore denied.

## VIII.

▇ Finally, Stewart seeks an evidentiary hearing on the question of whether the Government, in roughly 2000–01, negotiated an oral agreement with her former counsel in which the Government allegedly agreed to forgo any SAM-related prosecution of Stewart in exchange for her agreement to certain restrictions on her visits with Sheikh Abdel Rahman. Stanley Cohen, who represented Stewart at the time, has submitted a declaration adopting the affidavit of Stewart's current counsel which states that Cohen had a "good faith reasonable belief that he had foreclosed a criminal prosecution of his client Lynne Stewart while protecting her ability to serve her client." (Affidavit of Michael E. Tigar dated Jan. 10, 2003 ¶ 24; Declaration of Stanley Cohen dated Apr. 22, 2003 ("Cohen Aff.").)

The Government argues that there was no such agreement and, if there was, Stewart failed to live up to her end of the bargain. However, the Government has not submitted a sworn statement from any party with knowledge of the alleged negotiations. The Court is aware that "a district court need not conduct a hearing every time a defendant summarily accuses the government of failing to live up to an alleged bargain...." *United States v. Aleman,* 286 F.3d 86, 91 (2d Cir.2002). However, in this case, Stewart has submitted a sworn statement from an attorney with knowledge of the alleged oral agreement and "the government made a strategic decision to submit no factual evidence." *Id.* Under these circumstances, *Aleman* teaches that the Court should hold an evidentiary hearing to determine whether an agreement existed, what its terms were, and whether there was compliance with those terms. *Id.* at 91. The Court will hold an evidentiary hearing on August 26, 2003 at 9:30 a.m.[21]

## *CONCLUSION*

The motions to dismiss Counts One and Two as void for vagueness are granted. The motions to dismiss those Counts on all other grounds are denied. The motions to dismiss Counts Three, Four, and Five are

---

21. Stewart also seeks the right to issue subpoenas for witnesses and documents in connection with the evidentiary hearing, including for the former lawyer who submitted an affidavit for the defendant. The Government did not specifically respond to the request. The defendant does, of course, have the right to issue subpoenas in connection with the hearing and the recipients will have the right to make any appropriate motions to quash.

denied. The motions for severance are denied. The motion to dismiss Counts One, Two and Four as duplicitous is denied. The motions for bills of particulars are denied. The motion for an evidentiary hearing to determine whether the Government entered into a non-prosecution agreement with Stewart is granted as explained above. The Court has considered all of the arguments raised by the parties. To the extent not specifically discussed above, the arguments are either moot or without merit.

**SO ORDERED.**